## E. J. HERRINGER v. PETER O. INGBERG.[1]

December 4, 1903.

Nos. 13,649—(104).

**Libel.**

In an action for libel it is *held*: (a) That an alleged defamatory publication must be taken and construed in the light of the ordinary signification and import of its language; (b) that the natural and ordinary meaning of the language or words cannot be enlarged, extended, or restricted by innuendo; and (c) that the article complained of in this action is not libelous.

**Comment on Public Officer.**

A citizen has the legal right to comment fairly and with an honest purpose upon the conduct of public officers; and the publication of such comments, fair and temperate in tone, will not subject the author to an action for damages.

Appeal by defendant from an order of the district court for Norman county, Watts, J., denying a motion for judgment notwithstanding the verdict for $250, or for a new trial. Reversed.

*M. A. Brattland* and *Ole J. Vaule,* for appellant.
*John M. Hetland* and *F. H. Peterson,* for respondent.

BROWN, J.

Action for libel, in which plaintiff had a verdict, and defendant appealed from an order denying his alternative motion for judgment notwithstanding the verdict or for a new trial.

The facts are as follows: In 1900 the authorities of Norman county entered into contracts for the construction of what is called the "Hendrum-Hegne Ditch," which extends through the county from east to west for a distance of sixteen miles. The contracts were entered into in July, and by their terms the ditch was to be completed by January 1, 1901. Some of the contractors completed portions of the ditch covered by their separate contracts, but others failed to do so, and the matter ran along, the ditch uncompleted, until 1902. The failure fully to complete it was the cause of much discontent on the part of farmers affected

[1] Reported in 97 N. W. 460.

thereby, and it attracted considerable public attention. Plaintiff was county auditor at the time, and was charged with certain duties in respect to the contracts and the completion of the ditch, and was a candidate for office at the fall election of that year. On October 10, 1902, there appeared in one of the newspapers published in the county the following item:

> "Bondsmen of Contractors Will be Asked to Pay.
>
> "Auditor Herringer and Clerk of Court Ward was here Saturday, looking up matters in regard to the unfinished portion of the Hendrum-Hegne ditch, with a view to commencing proceedings against the bondsmen of the contractors who did not fulfil their contract.
>
> "The county has been somewhat lenient with them, owing to the difficulties encountered in the work, but they seem to have abandoned it entirely, and it has been decided to have it finished at once. Lenahan & Scribner are the contractors and C. W. Smith, subcontractor."

On October 22, following, defendant wrote and caused to be published in the Norman County Herald the following article:

> "Editor Herald: The Hendrum Review of October 10, has an announcement that County Auditor Herringer and Clerk of Court Ward were out looking over the Hendrum-Hegne ditch and stating that proceedings will be instituted to prosecute the bondsmen of the negligent contractor who failed to complete his contract and that it has been decided to have the ditch completed at once. I hope very much that such will be the case as the Hendrum-Hegne ditch has been the biggest failure that the county has undertaken to do from the letting of the contract up to the present date, and I hope that Herringer can for his own sake prove that he has had nothing to do with the management of said ditch, as those county officials that have proven their incapability to manage the county affairs should not be re-elected to continue similar failures.
>
> The ditch was let out on stations from the Red river east, through Hendrum, Hegne and McDonaldsville, and if I am correctly informed the price paid in Hendrum was 11 cents per

square yard or from three to four cents more than the state pays. for the digging of ditches. Why should the poor farmers along the ditch be compelled to pay more than the state does for such work? Are they more able than the whole state? It looks as though the county officials who were in charge of the matter had that opinion. If Mr. A. C. Tvedt, backed by J. C. Norby and others, had not come in on the day the contracts were made and bid the price down to 6, 7 and 8 cents per cubic yard, the whole ditch would probably have been let out at 11 cents per cubic yard, causing an additional cost of several thousand dollars. Thanks should be given to those who caused the saving in constructing the ditch. When the bidding was over, the contractors took off Tvedt's hands all the stations that he did not want at 6, 7 and 8 cents, thereby proving that the ditching could be done for less than eleven cents per yard. The contract was let so that the ditch should be ready in the fall of 1900, which was partly done in Hendrum from the Red river three or four miles east and completed in Hegne-McDonaldsville seven or eight miles, leaving three miles in Hendrum not dug at all so in the spring of 1901 all the water tributary to the ditch flooded the land in Hendrum and destroyed the crops of the farmers along the unfinished ditch.

Why has not the ditch been dug? It was to have been ready in about four months; now two years and four months have elapsed and no ditch finished. Why have not those in charge of the ditch hired some one else to do the work as they certainly have not paid for the work that has not been done? What makes the statement in the Review doubtful about finishing the ditch at once is that Herringer and Ward who are credited with that statement know that it cannot be done at once. The season is too late for ditching and it is most too late if anything is to be done to the bondsmen to get it in at the fall term of court, but it is good enough to put the ditch taxpayers at rest just now before election to be able to get their votes, knowing that the suffering ditch taxpayers got to pay the ditch tax or else lose their land. Ditch or no ditch, flooded or not flooded.

"Peter O. Ingberg."

On the contention that this article was libelous, intended by defendant as a reflection upon the honesty and integrity of plaintiff as county auditor, this action was brought for damages. The complaint alleges that the statements and inferences of the article are false; that the publication was malicious; and that defendant intended thereby, and was understood to mean by readers of the paper, that plaintiff's action as county auditor in respect to said ditch and the management of the same was corrupt and dishonest, and that he connived with the ditch contractors to defraud the farmers out of thousands of dollars. Two particular portions of the article are selected and made the basis of the cause of action. They are as follows:

> (1) "I hope that Herringer can for his own sake prove that he has had nothing to do with the management of said ditch as those county officials that have proven their incapability to manage the county affairs should not be re-elected to continue similar failures."

> (2) "Why should the poor farmers along the ditch be compelled to pay more than the state does for such work? Are they more able than the whole state? It looks as though the county officials who were in charge of the matter had that opinion, if Mr. A. C. Tvedt, backed by J. C. Norby and others, had not come in on the day the contracts were made and bid the price down to 6, 7 and 8 cents per cubic yard the whole ditch would probably have been let out at 11 cents per cubic yard, causing an additional cost of several thousand dollars."

Defendant answered, admitting that he wrote and caused to be published the article complained of, and that he had reasonable cause to believe, and did believe, at the time of its publication, that it was true; that it was published in good faith, without bias, and, so far as plaintiff was concerned, published for the sole purpose of commenting upon his fitness for the office for which he was a candidate; and denying that the article was intended to charge plaintiff with corruption or dishonesty of any kind. The cause was submitted to a jury, who returned a verdict for plaintiff.

The principal question presented in this court is whether the article complained of is libelous, and whether the complaint states facts suf-

ficient to constitute a cause of action. It was said in Davis v. Hamilton, 85 Minn. 209, 88 N. W. 744, that the law of libel is that any written or printed words are libelous which tend to injure the reputation or good standing of a person, and thereby expose him to public hatred, contempt, or ridicule; or which tend to degrade him in society, lessen him in public esteem, or lower him in the confidence of the community, even though the words do not impute to him the commission of a crime or immoral conduct. This was taken from the previous decisions of the court, as well as the statutes of the state, and is an accurate statement of the general rule on the subject.

But it is not every false and malicious charge against an individual, though reduced to writing, and published maliciously, that will sustain an action for damages. "It must appear," as said by Justice VANDERBURGH in Stewart v. Minnesota Tribune Co., 40 Minn. 101, 41 N. W. 457, "that the plaintiff has sustained some special loss or damage, following as a necessary or natural and proximate consequence of the publication; or the nature of the charge itself must be such that the court can legally presume that the party has been injured in his reputation or business, or in his social relations, or has been subjected to public scandal, scorn, or ridicule, in consequence of the publication." And as said by Justice MITCHELL in McDermott v. Union Credit Co., 76 Minn. 84, 78 N. W. 967, 79 N. W. 673: "Any discommendatory language used of and concerning a person is liable to do him injury, although such injury is often inappreciable in law. But nothing is better settled than that much discommendatory language, whether written or spoken, is not actionable per se, because not calculated to do the person of whom it is published any injury appreciable or cognizable by the law. The courts have, for practical reasons and considerations of public policy, to draw the line somewhere, and this has often to be done by a gradual process of exclusion and inclusion, depending upon the particular facts of each case as it arises."

In determining whether a given publication is libelous, the language thereof must be taken in its ordinary signification, and construed in the light of what might reasonably have been understood therefrom by the persons who read it. The question is, how would persons of ordinary intelligence understand the language? In this view we are of opinion that the article complained of is not libelous. The matters par-

ticularly complained of impute to plaintiff neither dishonesty or corruption, nor that he had connived to defraud the farmers out of thousands of dollars. It does not matter that the complaint so charges, for alleged defamatory words cannot be made broader, nor their natural meaning extended, enlarged, or restricted, by innuendo. Such is not the office of an innuendo. State v. Shippman, 83 Minn. 441, 86 N. W. 431; 13 Enc. Pl. & Pr. 49, et seq., and cases cited. The first portion of the article complained of simply expresses a hope that plaintiff can prove that he had nothing to do with the management of the ditch, for, if he had, his incapacity to manage the same would not warrant his re-election to office. The second portion complained of, giving it the broadest and most comprehensive construction, cannot be said to charge plaintiff with any misconduct in office. It merely suggests that the contracts were let at a price greater than was necessary, and that, if it had not been for certain persons appearing before the county officials at the time the contracts were let, and bidding the price down, they would probably have been let at eleven cents per cubic yard, thus causing an additional cost to the farmers of several thousand dollars. The article, in this respect, is doubtless true. If there were no bids except at the price of eleven cents per cubic yard for removing the earth from the ditch, the officials would have been required to let the contracts at that price, but, if others came in and bid a lower price, the officials would have been required to let to the lowest bidder. Taking the language in its ordinary meaning and import, it does not charge plaintiff with any wrongdoing whatever; nor does it expose him to public hatred, contempt, or ridicule, or tend to degrade him in society, or lessen him in public esteem.

Again, plaintiff was a candidate for re-election as county auditor, and the rule is thoroughly settled that a citizen has the right to comment fairly and with an honest purpose on the conduct of public officers. Wilcox v. Moore, 69 Minn. 49, 71 N. W. 917. As said in Odgers, Slander & Libel, 34, 40, every person has a right to discuss matters of public interest. All persons holding public positions are subjects for public discussion, and when a citizen, whether a newspaper editor or not, publishes an article of public interest, fair and temperate in tone, he may express his opinion on the conduct of such officers, and not be subject to an action for libel. Whoever fills a public office renders

himself open to public discussion, and, if any of his acts are wrong, he must accept the attack as a necessary, though unpleasant, circumstance attaching to his position. There has always been a distinction between publications relating to public and private persons as to whether they are libelous. A criticism might reasonably be applied to a public officer which would be libelous if applied to a private individual. A broad view of the article in question, and one that will give force only to the natural meaning of its language, satisfies us that it is not beyond the bounds of the law in this respect, and, whether maliciously published or not, gave rise to no cause of action in favor of plaintiff.

Order reversed.