# L. A. LYDIARD v. W. S. WINGATE AND OTHERS.[1]

December 17, 1915.

Nos.19,417—(81).

**Libel — retraction by publisher of newspaper.**

1. Defendants caused a circular letter to be published in certain news-papers of which they were neither owners nor publishers. It is held: The defendants are not within the provision of G. S. 1913, § 7901, requiring a demand for retraction before suit will lie.

**Criticism of public officials.**

2. The interest which every citizen has in good government requires that the right be not unduly curtailed to express his opinion upon public officials and political leaders, to seek and convey information concerning their plans and purposes, and to freely criticise proposed methods and measures.

**Libel — words not libelous per se.**

3. The article set forth in the complaint does not charge plaintiff with any moral or legal delinquency, nor does it reflect upon his character, and the acts and purposes imputed to him as a member elect of the legislature and as a political leader are neither corrupt nor such as are regarded by the public generally as dishonorable or discreditable from the viewpoint of practical politics, therefore the publication is not libelous *per se*.

Action in the district court for Hennepin county against W. S. Wingate, C. O. Lundquist, G. A. Gruman, B. T. Allen and George B. Safford, to recover $28,000 for malicious publication of the letter which is quoted in the opinion. From an order, Leary, J., overruling the demurrer of defendants to the complaint on the ground that the facts stated therein did not constitute a cause of action, defendants appealed. Reversed.

*Norton & Norton* and *John N. Berg,* for appellants.

*Healy & La Du,* for respondent.

[1]Reported in 155 N. W. 212.

Holt, J.

The court in overruling a demurrer to the complaint herein certifies the question involved to be important and doubtful. The action is for libel. The complaint after alleging that defendants maliciously published by circular letter and in certain named papers in Minnesota, "and in other newspapers generally circulated in the state * * * of and concerning plaintiff, these words": (omitting the caption of the letter head showing that it came from the headquarters of the Anti-Saloon League and naming the officers thereof)

"Brewers' Plot Promptly Unearthed.

"Scarcely had the votes, cast in the recent election, been counted before the selfish influences which controlled the legislature of 1911 began active work to secure absolute control of the machinery of the next House. Mr. L. O. Lydiard, an old hand at the business and a man who had been consistently wrong on every matter in which the interests of the people were involved, is the leader in the movement.

"If the newly elected members could be lined up and organized in such a way as to place men favorable to the brewery interests and their allies in control, they would be able to stifle practically all legislation inimical to their supposed interests. They would be able to obtain control of every appointment and would be able to use the patronage club effectively on every weak-kneed member.

"We feel that the people of the state should know what is going on so that they and the men recently elected to the House may be warned in due season and be on their guard against the plausible proposals of these reactionaries. The particular plot they were caught hatching appears to be to capture the Hennepin delegation of eighteen members, band them together under the unit rule, elect Mr. Lydiard chairman and eventually vote the entire eighteen for a speaker who could be trusted to organize the House in the interests of brewery control.

"It is imperative, therefore, for good citizens and good legislators to

use all proper means to drag this secret plot out to the light of day and prevent its success.

"Yours for an unfettered legislature,

"Geo. B. Safford,

"State Superintendent.

"Minneapolis, Minn., November 7, 1914.

"Please publish the above at the earliest possible moment. Late returns show a county option majority in both houses."

The first point raised by appellants is that the only publication alleged is in newspapers, and there is no averment of demand for retraction—a condition precedent to the maintenance of suit. Clementson v. Minnesota Tribune Co. 45 Minn. 303, 47 N. W. 781. Defendants are not the owners or publishers of the newspapers in which the alleged libel was published, hence cannot bring themselves within the provisions of G. S. 1913, § 7901.

No special damages are pleaded. No innuendoes apply the article, or any part thereof, to plaintiff. The application must be made from the article alone. By inference it may be assumed that plaintiff was a member elect of the legislature. It may also be gathered from the publication that for some time the saloon question has engaged the attention of the public; dividing it into two contending factions or parties; each party seeking to elect members of the legislature who would support the cause it espouses and enact laws favorable thereto. It is common knowledge that the legal voters of the state, and of the several communities thereof, are somewhat evenly divided on the proposition. When a question of this character reaches the stage where the inhabitants of the state become intensely interested in solving it by means of legislation, we have a political question similar in every respect to any political issue ever fought over by the great political parties of the land; and we may expect the fight to be carried on in the same manner. It is perhaps true that the old maxim (of doubtful ethical worth): "The end justifies the means," is sadly overworked in practical politics, and this apparently with no conscientious scruples, unless thereby aid or comfort has come to the opposition. While this is to be deplored, we must nevertheless recognize that the practice and rules of war are to some degree applicable to political controversies. It is necessary to

plan political campaigns. These plans are not always announced from the housetops. Often their success depends upon keeping them from the knowledge of the opposition. Concert of action between those of the same political faith is aimed at both in elections and in legislation. Such being the case, it follows that if one party thinks it has discovered some plan or plot to its undoing, formulated and about to be sprung by its antagonist, the alarm is at once sounded, and steps taken to avert the threatened danger. To impel its own members to effective effort and intimidate those of the opposition the alarm is, as a rule, excessively noisy and exaggerated. What would have been styled a fair and legitimate plan of action, had it been adopted in furthering its own purpose, is denounced as a conspiracy, plot or cabal when employed by the opposition. No one is seriously misled by these exaggerations, usually incident to political campaigns for votes and legislative measures. It is doubtful whether courts can assist good government by a ready attempt to curb criticism of party leaders or officials, unless it clearly appears that the criticisms, if false, accuse the individual of a positive wrong. For aught that appears in the letter published, plaintiff had a perfect right to ally himself with the opposition to the Anti-Saloon League; to seek the chairmanship of the Hennepin delegation; band it together under the unit rule, and try to elect a speaker that could be trusted as far as his side was concerned. That is all there is to the plot referred to in the heading—practically the only word in the article to which a meaning of mischief may sometimes attach. As political work goes there is nothing meriting the scorn or contempt of the public in all this. Even the patronage club has always been used by the party in power to further extend and secure its sway, regrettable though it be. Designating the opposition as the party under "brewery control" is but similar to the appellation given by any of the great political parties to its opponent, namely, that it is dominated by corporate interests. It may express a fact, but more often is a mere opinion. There is no allegation that plaintiff had secured his election by posing as a friend of the Anti-Saloon League; on the contrary, the publication conveys the idea that he had always been an avowed and consistent foe. The opinion expressed, that plaintiff "has been consistently wrong on every matter in which the interests of the people were

involved," voices merely the sentiment of a political organization having but one issue, and which consequently deems every one in the wrong who refuses to support that issue regardless of every other consideration. In short, the article imputes to plaintiff no moral or legal delinquency, nor any unworthy act even as viewed from the standpoint of a fair political opponent.

In good government and in laws to be enacted in furtherance thereof, all persons have an interest. They have a right to be informed, and to inform others concerning plans and purposes of organizations or parties whose work affects legislation. Therefore too strict censure cannot be drawn upon the right of free speech in such matters. It may be true that the publication tends to subject plaintiff to the hatred of some of the more rabid Anti-Saloon League adherents, but we must not forget that it also assures him the plaudits of those bitterly opposed to the activity of the league. It will not do to assume that none but violators of law and those of disreputable tendencies are found in the ranks of the opposition to the Anti-Saloon League, or that the league has gathered in all the moral, law-abiding citizens. Looked at broadly we do not think the article tends to bring upon plaintiff the hatred or contempt of the general public. It contains nothing reflecting upon his private character, or calling, and imputes to him no act of a nature generally regarded as disreputable or even discreditable in political tactics.

In Sillars v. Collier, 151 Mass. 50, 23 N. E. 723, 6 L.R.A. 680, words spoken of a representative were: "I am sorry that the representative from this district has had a change of heart. Sometimes a change of heart comes from the pocket." By proper innuendoes it was stated that thereby the defendant intended to express that from corrupt considerations the plaintiff had changed his position. The reasoning of the court in sustaining a demurrer is applicable here, although it is to be noticed that the case was one of slander. The opinion, after stating it to be assumed that plaintiff was elected to the House of Representatives, and that the words were spoken of him as an official, proceeds: "This being so, no averment of special damages was necessary, provided the words are defamatory, and to make them defamatory it is not necessary that they should import a charge of crime. It would be sufficient

if they imported such misconduct as would expose him to expulsion, or even to censure, from the House, and we are inclined to think also that it would be sufficient if they imported such conduct as would, by the general sense of the community, be deemed immoral, or discreditable in such a way as clearly to impair his influence and lessen his position and standing as a public man, and thus to affect him injuriously as a member of the legislature. * * * The expression of the defendant's opinion that the plaintiff as a member of the legislature is of such a disposition, wavering in mind, and open to change his course from improper motives and inducements, is not actionable, without averment and proof of special damages. It is one of the infelicities of public life, that a public officer is thus exposed to critical and often to unjust comments; but these, unless they pass the bounds of what the law will tolerate, must be borne for the sake of maintaining free speech."

The second published article considered in Shaw v. Crandon Printing Co. 154 Wis. 601, 143 N. W. 698, appears more damaging in its insinuations than the publication here involved, and still the court held it not libelous. See also Ruhland v. Cole, 143 Wis. 367, 127 N. W. 959; Arnold v. Ingram, 151 Wis. 438, 138 N. W. 111, Ann. Cas. 1914C, 976, holding that a libel should not be too readily seen in publications relating to criticisms or opinions concerning the acts of public officials. To the same effect may be cited the decisions of this court in Herringer v. Ingberg, 91 Minn. 71, 97 N. W. 460; Wilcox v. Moore, 69 Minn. 49, 71 N. W. 917; and Marks v. Baker, 28 Minn. 162, 9 N. W. 678.

Cases relating to publications which attack the private character of a plaintiff therein or belittle and ridicule him as a member of the community, or those charging crime or corruption in office, or the use of falsehood and dishonorable means by an official in matters pertaining to his office or calling are not in point. Under this category come the following cases cited by plaintiff: Larrabee v. Minnesota Tribune Co. 36 Minn. 141, 30 N. W. 462; Petsch v. Dispatch Printing Co. 40 Minn. 291, 41 N. W. 1034; Bram v. Aitken, 65 Minn. 87, 67 N. W. 807; Wilcox v. Moore, 69 Minn. 49, 71 N. W. 917; Sharpe v. Larson, 67 Minn. 428, 70 N. W. 1, 554; State v. Shippman, 83 Minn. 414, 86 N. W. 431; Craig v. Warren, 99 Minn. 246, 109 N. W. 231; Tawney v. Simonson, W. & H. Co. 109 Minn. 341, 124 N. W. 229, 27 L.R.A.(N.S.)

1035; Cole v. Millspaugh, 111 Minn. 159, 126 N. W. 626, 28 L.R.A. (N.S.) 152, 137 Am. St. 546, 20 Ann. Cas. 717; Palmerlee v. Nottage, 119 Minn. 351, 138 N. W. 312, 42 L.R.A.(N.S.) 870; Tillson v. Robbins, 68 Me. 295, 28 Am. Rep. 50; Eviston v. Cramer, 47 Wis. 659, 3 N. W. 392; Morse v. Times-Republican Printing Co. 124 Iowa, 707, 100 N. W. 867.

Our conclusion is that the article is not *per se* libelous, therefore the demurrer should have been sustained.

Order reversed.