**CANNON v. BEE NEWS PUB. CO. et al.**

**No. 2747.**

District Court, D. Nebraska, Omaha Division.

Oct. 16, 1933.

Sidney W. Smith, of Omaha, Neb., for plaintiff.

Kennedy, Holland & DeLacy, of Omaha, Neb., for defendant.

DONOHOE, District Judge.

The allegations of the petition essential to a determination of the matter now involved are, in substance, as follows: That plaintiff is an internationally known churchman and social welfare leader; that the defendants, with a purpose to destroy his prominence and usefulness, wickedly and maliciously published the following alleged false, defamatory

and libelous article in the Omaha Bee-News, under date of July 22, 1930, to wit:

"Reveal Cannon's Romance before Death of Wife.

"Introduced Self to Widow in Hotel Lobby; Wed at London

"Universal Service

"New York, July 21—An informal meeting in the lobby of the Hotel McAlpin, two years ago, was disclosed Monday as the romantic episode that led to the marriage of Bishop James Cannon, Jr., and Mrs. Helen Hawley McCallum, New York widow.

"Announcement of the secret wedding last Tuesday in the socially correct Mayfair section of London of the militant foe of Alfred E. Smith, fell like a bolt among the prelate's friends Monday. None but a few had known of Cannon's long friendship with his bride.

"Mrs. McCallum, widow of H. C. McCallum, Jr., of Detroit, Mich., had lived at 134 West Eighty-Sixth Street. When the widow first met the Bishop under such informal circumstances, the Bishop introduced himself.

*"Introduces Himself*

"Mrs. McCallum was walking through the lobby with a woman friend. As she stood talking to her friend, the churchman, with disarming directness, approached and addressed himself to her saying:

" 'Is it raining out?'

"It was raining, indeed. The Bishop had a car. Would the ladies ride? So the bishop drove them to Mrs. McCallum's cozy home.

"It developed both nurtured a burning antipathy to Alfred E. Smith, who then was a candidate.

*"Bishop's Wife Dies*

"Their friendship was temporarily interrupted one night when Bishop Cannon, in Mrs. McCallum's apartment, received word of the serious illness of his wife, the former Lura Virginia Bennett, of Louisa, Va. The Bishop rushed to her bedside. She died.

"A few days after the funeral Bishop Cannon returned to the McCallum apartment to receive the sympathetic condolences of the widow. The visits continued.

"In February, 1929, the Bishop was to make a tour of the Holy Land. Mrs. McCallum became his secretary, returning with him in April.

"It was then that the Bishop wrote a letter suggesting he might ask her to marry him.

*"Went to England*

"A short time ago Mrs. McCallum went with Bishop Cannon to England, where she stayed at the home of Sir Henry and Lady Lunn. Sir Henry is editor of the Review of Churches.

"Mrs. McCallum, it is reported, had not been well, and it was decided that she stay in England while the Bishop sailed to Brazil to inspect missionary work. But then, it was pointed out, the sea trip would be beneficial for Mrs. McCallum."

Plaintiff then avers that by inuendo, it was thereby intended to convey the meaning:

(a) That the wedding was secret.

(b) That he kept the acquaintance from his family and friends.

(c) That the plaintiff and the said Mrs. McCallum were guilty of improper and immoral conduct at the time referred to.

(d) That the plaintiff at the time his late wife was on her deathbed was guilty of visiting the said Mrs. McCallum at her apartment in the capacity of lover and of committing adultery with the said Mrs. McCallum.

The plaintiff alleges that he has thereby suffered damages and prays judgment in the sum of $500,000.

■ To this petition the defendants have filed a general demurrer, which now imposes upon us the duty to determine whether the language used in the publication can fairly and reasonably be construed to have the meaning imputed to it in the petition. Kee v. Armstrong, 75 Okl. 84, 182 P. 494, 5 A. L. R. 1349, 1356. Citing Harris v. Santa Fé, 58 Tex. Civ. App. 506, 125 S. W. 77; Penry v. Dozier, 161 Ala. 292, 49 So. 909; Emig v. Daum, 1 Ind. App. 146, 27 N. E. 322; State v. Huff, 96 Kan. 632, 152 P. 642; Sheibley v. Ashton, 130 Iowa, 195, 106 N. W. 618.

■ A careful reading of the publication satisfies us that there is no ambiguity in the words used, and consequently these words should be given their plain ordinary meaning. New York Evening Post Co. v. Chaloner (C. C. A.) 265 F. 204; National Refining Co. v. Benzo Gas Motor Fuel Co. (C. C. A. 8th Cir.) 20 F.(2d) 763, 55 A. L. R. 406.

■ Another elementary rule of law is that, if the defamatory words do not constitute slander in themselves, the inuendoes cannot enlarge or add to their legal meaning and

effect. This rule is very well stated in Brinsfield v. Howeth, 107 Md. 278, 68 A. 566, 567, 24 L. R. A. (N. S,) 583, from which I quote the following: "If the declaration is not otherwise good, the innuendoes cannot make it good. They cannot add to or enlarge the sense of the words used, and if the alleged defamatory words do not constitute slander in themselves, the innuendoes cannot enlarge or add to their legal meaning and effect. The innuendo is merely a form or mode of introducing explanation. It serves to point out some matter already expressed. It may apply to what is already expressed, but cannot enlarge the sense of the previous words. The legal effect of the innuendo is a question of law, which arises under the demurrer. This court, in Lewis v. Daily News Company, 81 Md. 472, 32 A. 246, 29 L. R. A. 59, said: 'Upon demurrer it is always the province of the court to determine whether the words charged in the declaration amount in law to libel or slander. Dorsey v. Whipps, 8 Gill [Md.] 462; Haines v. Campbell, 74 Md. 158, 21 A. 702, 28 Am. St. Rep. 240; Avirett v. State, 76 Md. 510, 25 A. 676, 987. It is equally a matter of law as to whether an innuendo is good; that is to say, whether it is fairly warranted by the language declared on, when that language is read, either by itself, or in connection with the inducement and colloquium, if there be an inducement and colloquium set forth. Avirett v. State, supra; Solomon v. Lawson, 8 Q. B. 828.' Mr. Chitty, in his work on Pleading (volume 1, p. 400), states the rule to be that, 'if the libel or words do not naturally and per se convey the meaning the plaintiff wishes to assign to them, or are ambiguous and equivocal, and require explanation by reference to some extrinsic matter to show that they are actionable, it must be expressly shown that such matter existed, and that the slander related thereto.' * ⁂ * Words will not be construed to impute unchastity, if in their milder sense they may have another harmless meaning, unless it is made to appear by the averment of extrinsic facts that the defendant meant to traduce the character of the plaintiff for chastity." See, also, the following cases, which are in point: Moss v. Harwood, 102 Va. 386, 46 S. E. 385; Herringer v. Ingberg, 91 Minn. 71, 97 N. W. 460; Radke v. Kolbe, 79 Minn. 440, 82 N. W. 977; Hemmens v. Nelson, 138 N. Y. 517, 34 N. E. 342, 20 L. R. A. 440.

■ With the foregoing principles of law in mind, let us now consider the published article in question with a view to determining whether or not it is actionable per se.

First, with reference to the manner in which plaintiff introduced himself. The only inference that can be drawn from the statement is that it was raining; that there were two ladies in the lobby of a hotel desiring to go somewhere. The plaintiff, observing their distress, introduced himself, and offered them the courtesy of taking them to their destination, which was accepted, and that the plaintiff thereupon drove them to the home of the lady in question. Nothing libelous about that statement—nothing unusual or scandalous. It is merely a gentlemanly courtesy that might be expected from the plaintiff under the circumstances.

■ The next statement in the article is to the effect that one night while the plaintiff was in Mrs. McCallum's apartment he received word of the serious illness of his wife, and that the plaintiff then rushed to his wife's bedside, and shortly thereafter she died, that after the funeral he returned and again visited Mrs. McCallum, and received her sympathetic condolences; that thereafter he continued to visit her, and that later he proposed marriage, and that they were married from the home of Lord and Lady Linn in England, and after the wedding took a sea voyage. Nothing improper can be reasonably inferred from the matter therein stated. There was nothing immoral or improper in the plaintiff visiting Mrs. McCallum at her home. As a matter of fact, men of his calling are expected and required to visit their parishioners in their homes, and this is a common practice. His wife was taken suddenly ill. It so happened that the plaintiff at the time was calling on Mrs. McCallum, but he immediately hastened to his sick wife's bedside, which was the natural thing to expect under the circumstances. That the friendship should later ripen into affection that resulted in marriage is not extraordinary, but is the ordinary and usual process which the negotiations leading up to marriage usually take. Upon the death of his wife, it was perfectly proper that the bishop should seek the sympathetic condolences of his friends, and it was perfectly proper that he should marry again.

■ The only reference to a secret marriage is in the first part of the article, in which it says: "Announcement of the secret wedding last Tuesday in the socially correct Mayfair section of London, etc." Suppose the wedding was secret—many of the best people on earth have kept their wedding secret from their friends, at least for the time being. They had a right, if they saw fit, to withhold

the knowledge from their friends, and friends could bear no complaint by reason of their decision in that respect. There is nothing libelous or wrong about a secret marriage in so far as one's friends are concerned.

Reading the whole article over, and giving the words their plain ordinary meaning, no slanderous or libelous statements will be found therein. Now it is possible that to an evil eye serving an immoral mind, one of such might draw deductions therefrom which are not justified by the statements. Still, it is to be rejoiced that the minds of the great mass of humans throughout the world are clean and wholesome and are not prone to attribute evil where none appears or none exists.

We conclude that the plaintiff is supersensitive, and in this he may be excused due to the "pitiless publicity" to which his prominence subjects him. He should realize, however, that it is the price which he must pay for being in the limelight. He must expect his words and personal acts to be freely published. It may be irksome, but the law gives no redress for such publicity.

Having come to this conclusion, there is nothing left to do but to sustain the demurrer and dismiss the action. It is so ordered.