# W. S. FULLERTON v. GEORGE THOMPSON and Another.[1]

October 10, 1913.

Nos. 18,108—(241).

**Libel.**

1. A publication, which purports to convey the meaning that a public official in an official report has charged a public servant with misconduct in office, is libelous if not true in substance.

**Same — privileged publication.**

2. The trial court held the occasion for the publication privileged. He rightly left the jury to say whether the publication exceeded the privilege, for, considering the title and headlines of the article, and comparing its contents with the report it purports to give and discuss, it cannot be said as a matter of law that it is a true resumé thereof. To be protected as privileged the publication must be true in substance.

**Fair comment upon public officer.**

3. Neither can it be held as a matter of law that the publication was excused as a fair comment upon official conduct, honestly made in belief of the truth thereof and upon reasonable grounds for such belief. If the jury find the publication as to the report substantially distorted or untrue, it might justify the conclusion that the comments thereon were neither fair nor made in good faith.

**Any member of board may sue for libel.**

4. If the jury found the publication libelous, plaintiff can maintain the suit, for it appears clearly that each member of the board referred to in the publication participated in the alleged misconduct.

[1] Reported in 143 N. W. 260.

Action in the district court for Ramsey county against George Thompson and the Dispatch Printing Co. to recover $15,000 for libel. The answer alleged that the article published was a fair and true report of the official examination and report of the public examiner of the accounts of the Board of State Medical Examiners and of the records and documents therein referred to; that the article was not intended to charge and did not charge plaintiff, either alone or with anybody else, with larceny; nor was meant to charge and did not charge that plaintiff, either alone or with anyone else, had unlawfully converted $6,000 or any other sum of the moneys belonging to the state to his private purposes; and that the article as published was true. The reply denied that the public examiner, in person or by deputy, made an official examination or report of the accounts of the board, but admitted that a deputy public examiner made an unofficial report of an unofficial examination. It also denied that the article was a fair comment upon such report and denied that the comment was made, honestly believing the article to be true, and denied that the article published was true. The case was tried before Kelly, J., who denied the motion of defendants to dismiss the action and their motion to direct a verdict in their favor, and a jury which returned a verdict of $700 in favor of plaintiff. From the order denying defendants' motion for judgment notwithstanding the verdict and granting their motion for a new trial, unless plaintiff consented to a reduction of the verdict to $350, they appealed. Affirmed.

*Durment, Moore & Oppenheimer,* for appellants.

*W. R. Duxbury,* for respondent.

HOLT, J.

Plaintiff recovered a verdict of $700 for libel. Defendants moved for judgment notwithstanding the verdict or a new trial. The court denied the judgment asked, but granted a new trial unless plaintiff consented to a reduction of the verdict to $350. Plaintiff has not consented to the reduction, and defendants appeal.

The article complained of was published by defendants in the St. Paul Dispatch, a daily newspaper, on May 21, 1912. It was

written by a reporter in the employ of the defendant company, except the so-called headings. These latter were interspersed in large type, presumably to attract attention, and were prepared under the direction of the city editor of the paper. The article with the headings in capitals is as follows:

## "USE STATE CASH TO BUY DINNERS.

### "EXAMINER SAYS MEDICAL BOARD HAS IGNORED AN ORDER TO RETURN FEES.

### "SUM INVOLVED ALMOST $6,000.

### "MEALS, CIGARS AND TAXICABS HAVE BEEN CHARGED TO STATE BY MEMBERS OF BOARD.

"Reveling in $20 dinners, smoking choice Havana cigars, riding in taxicabs and 'splitting up' practically all the money that has come into its hands, the State Board of Medical Examiners has spent nearly $6,000 since May 1, 1910, which rightfully belongs to the state, according to charges made by Andrew Fritz, state public examiner, in a report made to the Governor to-day.

"While he makes no direct accusation, Mr. Fritz points to an opinion given by Lyndon A. Smith, Assistant Attorney General, in 1910, in which he said that the 'reciprocal fees' of $50 each, collected by the board, should be turned into the state treasury. Since the opinion was given, the board has collected and kept $6,110, less $985.86 now on hand.

## "ATTORNEY GENERAL'S VIEWS IGNORED.

" 'Reciprocal fees' come from physicians, who, having obtained license to practice in other states, come to Minnesota and are admitted to practice here without further examination, on payment of the $50 fee. Former Public Examiner Anton Schaefer could find no law giving the board of medical examiners a right to keep the fees,

and asked the attorney general's department for an opinion. Replying, Mr. Smith said the money belonged to the state, and should be paid into the treasury. The letter was dated June 8, 1910. The board ignored it, and has continued to keep the money.

## "STATE BUYS MEALS AND CIGARS.

"Examination of the records kept by the board reveals some interesting charges for expense. For instance, in August, 1911, a dinner was given by the board to its members which cost $20.25. At the meeting of the board to discuss business matters, $3.75 worth of cigars were smoked. In July W. S. Fullerton drew salary amounting to $100 and $107.85 for attending a board meeting. The bill for dinner in May, 1911, amounted to $14.65; in June to $20.25; in November to $16, and in February, 1912, to $14.90 with $4.50 for cigars.

## "TAXICAB CHARGED TO STATE, TOO.

"On November 1, 1910, W. S. Fullerton was given a salary increase of $25 a month for the ten months which had just preceded, and he drew $250 in a lump. At the same meeting at which he was allowed the money, a charge of $4.75 was ordered paid to R. A. Becker & Son for 'cigars, etc.' A charge of $6 for taxicab service was recorded at the July meeting, 1910.

"Charges for attending board meetings usually hovered near the $50 mark, but in many instances went nearer to $100. The following are the regular account charges allowed by the board, according to the public examiner's report:

"Examining papers, each ............................... $1.00
"Attending board meetings, per day ..................... 20.00
"Conducting examinations, for each half day ............ 5.00
"Committee meetings ................................... 10.00
"Translating examination papers ...................... 15.00

### "DOES NOT ACCUSE BOARD.

"After recommending that all fees collected by the board be paid into the state treasury and that payments to the board members be then made by regular vouchers, presented to the state auditor, the report of John Swinborne, who made the examination for Mr. Fritz, concludes: 'The tendency of the board and all boards of like nature is to be extravagant.' Mr. Swinborne says the present board is merely following precedent and does not accuse its members of intentionally doing wrong.

"Public Examiner Fritz said today he would go deeper into the probe of the acts of the medical board of examiners, and it is possible that suit may be instituted against them to get back the money which the attorney general says belongs to the state.

"The members of the present board of medical examiners are J. W. Anderson, Mankato, Minn., President; Frank B. Hicks, Grand Marais, vice president; Thomas McDavitt, St. Paul, secretary-treasurer; J. E. Campbell, South St. Paul; F. R. Weiser, Windom; Charles Bolsta, Ortonville; A. C. Moffat, Howard Lake; Annah Hurd, Minneapolis, and R. D. Matchan, Minneapolis."

Since plaintiff has not consented to the reduction required by the court, the motion of the defendants for a new trial has in effect been granted, and therefore the only question upon this appeal is the right of defendants to a directed verdict or judgment in their favor. Their contentions are: (a) The article is not libelous, (b) the occasion was privileged and the publication is excused as a fair criticism of public servants, (c) the truth was proven, and (d) the plaintiff individually has no cause of action, the accusation being against a board.

Plaintiff alleged that the publication accused him of larceny or conversion of state funds. This defendants specifically deny in the answer which admits the publication and by way of justification and excuse alleges: That the state public examiner had made an official examination and report of the affairs and accounts of the state board of medical examiners; that this report related to public matters in which all citizens were interested; that after examining this report

the article was composed and published in the honest belief that it was true and upon reasonable grounds for such belief, without malice; that the article was a fair comment upon said report and the documents and records therein referred to; and that the article as published was true.

The learned trial court construed the article to be a purported résumé of the official acts of public servants, and as such privileged, if true; and also held that in so far as it consisted of fair comments made in good faith, and based on the assumption of the truth of official reports and opinions it was excusable. So viewing the publication, and that is as favorable to defendants as they can well ask, it must nevertheless be held libelous, if false and unfair in substance. The complaint so alleges.

Does the evidence show the publication privileged or excused as a matter of law? The attorney general's opinion given to a former public examiner is not referred to in any manner in the report filed with the Governor and under which defendants attempt to justify. The public examiner's report does not in any manner touch upon the fees which the publication characterizes as state funds, except as contained in the following excerpt:

"I respectfully refer you to chapter 236, G. L. and section 2302, R. L. 1905. It is a fact that the fees received from these two sources 'Reciprocity Fees' and 'Midwifery Fees' have been for years past and are now being used by the board for general expenses. The law does not provide that same shall be used for the use of the board, neither does it say they shall not be thus used. .

"The past boards so interpreted the law and thereby formed a precedent, and I am sure the present board do not feel that they are doing wrong. Without the use of the $50 fees for 'Reciprocity' the board would be very much hampered and unable to continue the work in the manner in which they are now doing.

"The next legislature should be asked to take these matters up and make the laws more definite, either that said board shall pay certain fees in to the state treasurer or may use them toward running expenses. I would very strongly recommend that all fees collected should be paid into the state treasury and that all payments be made

by vouchers presented to the state auditor, accompanied by subvouchers.

"The tendency of the board and all boards of like nature, is to be extravagant. If they were obliged to have subvouchers for railroad fare, hotel bills, and miscellaneous items, I am sure the saving to the state would be a very large amount on the whole."

It is plain that neither Mr. Fritz nor Mr. Swinborne, the deputy who made the examination and report, in any manner expressed an opinion that the funds belonged to the state or were used without right by the members of the board of medical examiners. The proof shows no accusation of improper use of funds by the board of medical examiners in the report of the former examiner to the Governor, except that with regard to the expense of $70.45 for cigars smoked at board meetings during the previous four years, it states: "This is not a legitimate expense, though the treasurer claims otherwise."

Soon after receiving this last-named report from his deputy who made the examination Mr. Schaefer, the then public examiner, asked for and obtained the opinion from the attorney general referred to in the publication, which held that "no examination fee can be charged to any physician licensed to practice in another state when he wishes to be admitted to practice in this state, unless there be an actual examination and that, in the absence of any act providing for the disposition of the fifty dollars charged where an examination is actually given to such applicant for admission to practice medicine in this state, the fifty dollars should be paid into the state treasury." No formal opinion was given to the board. It however had knowledge of the one given to Mr. Schaefer and discussed it, but still maintained that it was entitled to the fees mentioned.

In order to justify as a privileged publication of an official report, the proof must show that the pretended publication of the report is true in substance. If a garbled report is published, or the facts therein contained are perverted so as to convey the meaning that an official therein referred to had committed a crime or had been guilty of misconduct, when no such meaning could fairly be drawn from the report, justification is not made out and the occasion of privilege fails. From what has been stated in respect to the contents of the

report under which the privilege and justification is claimed, we think it is clear that it was for the jury to say whether the publication was a distortion or falsification thereof to the injury of plaintiff's reputation.

In considering whether a publication is libelous the language used has to be taken in its ordinary meaning. Stroebel v. Whitney, 31 Minn. 384, 18 N. W. 98; Davis v. Hamilton, 85 Minn. 209, 88 N. W. 744. If there be any ambiguity, it is for the jury to determine the meaning. Pratt v. Pioneer Press Co. 30 Minn. 41, 14 N. W. 62. Not only the article itself but the title and headlines are to be considered. Landon v. Watkins, 61 Minn. 137, 63 N. W. 615; Craig v. Warren, 99 Minn. 246, 109 N. W. 231; Tawney v. Simonson, Whitcomb & Hurley Co. 109 Minn. 341, 124 N. W. 229, 27 L.R.A.(N.S.) 1035. It might well be contended that the sinister and libelous character comes largely from the title and headlines of the publication and the difficulty of reconciling apparently inconsistent statements to be found therein. If a publication goes beyond the occasion it exceeds the privilege, Landon v. Watkins, supra. The jury was warranted in so finding upon this record.

We are also of the opinion that whether the publication is excused as fair comment and justifiable criticism of plaintiff, based on the report of the public examiner and the opinion of the attorney general, is also for the jury.

Newspapers in giving publicity to matters found in official reports and in taking notice of official misconduct perform a valuable service to the public. And, although the acts of public servants are thus quite often subjected to unjust criticism, this is a burden necessarily connected with public office which, within reasonable bounds, must be borne in silence. "All persons holding public positions are subjects for public discussion, and when a citizen, whether a newspaper editor or not, publishes an article of public interest, fair and temperate in tone, he may express his opinion on the conduct of such officers, and not be subject to an action for libel." Herringer v. Ingberg, 91 Minn. 71, 97 N. W. 460. But applying the rule thus stated it must be held that it cannot be said that the publication, in so far as it adds to the public examiner's official report

by inferences, comments and headlines, is, as a matter of law, either a true résumé thereof, or a fair criticism of official conduct based thereon. The limitation upon the right to publish résumés of official reports and comments upon official conduct based on such reports is that the résumé must not be distorted and the comment must be fair, honestly made, in the belief of the truth thereof and upon reasonable grounds for such belief. While strictures might well be passed upon the practice of spending for cigars money designed to carry on the work of the board, the evidence fails entirely to sustain statements that Mr. Fritz had charged the board with taking state funds, or that it had been ordered to refund, or that any member had spent any money to ride in taxicabs. As a matter of fact Mr. Swinborne's report makes it clear that the law is indefinite as to the right of the board or the state to the fees mentioned, that the board had always insisted on the right thereto, and that its work could not well be done without the use of such fees. In short, that the law was in such a state of doubt and uncertainty on the proposition that the deputy examiner deemed further legislation highly desirable. We cannot say that a jury may not properly find that the privilege was exceeded and hence draw the conclusion of absence of good faith and presence of malice in the publication. Prewitt v. Wilson, 128 Iowa, 198, 103 N. W. 365; Moore v. Dispatch Printing Co. 87 Minn. 450, 92 N. W. 396.

What has already been said sufficiently indicates that the defense of the truth of the publication was not made out as a matter of law, whether the publication be given the construction contended for by plaintiff or the one evidently taken by the answer and adopted by the court.

The point is made that the charges of misconduct relate to the board as such and not to any individual member thereof. It is said that plaintiff may have opposed the action of the board in respect to the disposition of these fees. The contention is without merit. The publication conveys the meaning clearly that each member of the board participated in whatever was done with the fees col-

lected from physicians moving into this state and licensed to practice here by the board.

Order affirmed.

Bunn, J., took no part.