**Donna W. SCHUSTER and Donald E. Hanson, Appellants,**

v.

**U. S. NEWS & WORLD REPORT, INC., a corporation, and Time, Inc., a corporation, Appellees.**

**No. 79–1065.**

United States Court of Appeals, Eighth Circuit.

Submitted May 17, 1979.

Decided Aug. 6, 1979.

---

James M. Williams, Minneapolis, Minn., argued and filed brief for appellant.

Peter S. Hendrixson (argued) Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., Covington & Burling, Washington, D. C., on brief for appellee U. S. News.

John P. Borger (argued) Faegre & Benson, Minneapolis, Minn., and John D. French, Minneapolis, Minn., and Cravath, Swaine & Moore, New York City, on brief for appellee Time.

Before GIBSON, Chief Judge, and HEANEY and McMILLIAN, Circuit Judges.

GIBSON, Chief Judge.

This diversity case charging libel comes to us after being removed from the Minnesota state court to the federal district court. Donna Schuster and Donald E. Hanson are, by their own admission, distributors and sellers of vitamin B–17, better known as Laetrile. Schuster describes herself as having been nationally and internationally known as an advocate of the use of natural foods such as Laetrile, and as the recognized leader in the struggle against "vested commercial interests controlling the Food and Drug Administration and (the) American Medical Association." Hanson accepts the appellation of business associate of Ms. Schuster, and claims. that while he did not occupy a position of social and business prominence comparable to that of Donna Schuster, he has been well known in music and entertainment circles. Hanson and Schuster brought this action for libel, contending that articles published in the defendant magazines were actionable defamation and caused damage to the personal and business reputations of the plaintiffs. The District Court [1] granted summary judgment for the defendants and ruled that under Minnesota law this diversity action failed because the articles could not reasonably be understood to be of and concerning the plaintiffs. Further, to the extent that the articles described a federal grand jury indictment, the court ruled they were privileged as fair and accurate reporting of judicial proceedings. Hanson and Schuster appeal, contending that the District Court erred on both rulings. We affirm.

In its June 21, 1976, issue, U. S. News & World Report published an article entitled, *What the Health Quacks are Peddling now.*[2]

> Many of the most blatant medical charlatans of the past have been driven out of business as the result of efforts by the American Medical Association, the Food and Drug Administration, the Postal Service and the Federal Trade Commission, as well as by tough new laws in some States.
> Those who have taken their place range from fast-buck artists who can work a medical mail-order fraud in as little as 30 days to those who cloak their operations in constitutional safeguards by accepting donations for spiritual healing rather than charging fees for medical treatment.

---

1. The Honorable Harry H. MacLaughlin, United States District Judge, District of Minnesota. The District Court opinion has been published.. *Schuster v. U. S. News & World Report, Inc.,* 459 F.Supp. 973 (D.Minn.1978).

2. U. S. News & World Report, June 21, 1976, at 45. The critical language from this article includes:

   > A new breed of medical quacks—smoother, more subtle than their predecessors—is bilking the American public of an estimated 2 billion dollars a year.
   > 　*　　*　　*　　*　　*　　*

It discussed in general but derogatory terms various treatments offered for cancer, arthritis, and weight problems. In addition, the same issue included an article entitled, *Heating Up: Latest Battle Over a Cancer "Cure"*.[3] It was shorter but specifically dealt with the Laetrile controversy in the United States and a grand jury investigation in San Diego, California, in which nineteen were accused of smuggling Laetrile into the United States from Mexico.

\* \* \* \* \* \*

*Cancer.* In contrast to the standard treatment for cancer—surgery, radiation and chemotherapy—which may be painful and disfiguring, the quack remedy is simple and painless. It is a pill. An injection. A trip to the mountains. A nutritious diet.

\* \* \* \* \* \*

The American Cancer Society has drawn up a list of more than 50 "unproven methods of cancer management" that include extracts of bamboo grass, injection of fresh animal cells, coffee enemas and sweat-sensing devices.

As detailed in the box on page 46, one of the largest of such "cancer cure" operations—the administering of laetrile in Mexico and its illegal importation into the U.S.—is now under attack by federal authorities.

One publication circulated among cancer sufferers said it did not recommend self-treatment. But it went on to describe approvingly how an Ohio woman treated herself for cancer of the colon with massive detoxification through coffee enemas, vitamin B–17 tablets and a diet of fresh, raw fruits and their juices. She claimed that her tumor vanished in one week.

3. U. S. News & World Report, June 21, 1976, at 46. The significant language from the article includes:

The Federal Government has begun a major crackdown on the purveyors of laetrile, a cancer "cure" made from the pits of apricots.

On May 26, a grand jury in San Diego, Calif., accused 19 persons of smuggling laetrile into the U.S. from laboratories that produce it in Tijuana, Mexico.

"In California, laetrile is the No. 1 quackery," says Mike Bogumill of the food and drug section of the California State health department. "It's been the big one for the past four or five years."

Although the drug, also known as amygdalin and vitamin B–17, has been condemned as useless by the Federal Food and Drug Administration, the National Cancer Institute and the American Cancer Society, it is still in use by thousands of cancer patients in the country who either pay large amounts for smuggled laetrile or visit clinics in Tijuana for shots.

This article purported to present both sides of the controversy over the use of Laetrile in the treatment of cancer. Neither of the articles specified any individual advocating the use of Laetrile[4] other than John Steinbacher, executive director of the International Association of Cancer Victims and Friends.

The June 7, 1976, issue of Time headed its Medicine section, *Laetrile Crackdown*.[5]

*A "sad" sight.* "What is sad is to see people wasting their last nickel or dime in Mexico being hauled over dusty roads to clinics," says Herbert B. Hoffman, the federal prosecutor who headed the team whose investigation resulted in the May 26 indictment.

\* \* \* \* \* \*

In a tragic number of cases, those who have tried to verify claims of cures based on laetrile therapy have found the patients dead or dying of cancer. In 1973, Pennsylvania authorities confiscated a movie showing patients "cured" of cancer by laetrile. When an attempt was made to contact those shown in the film, all were dead of cancer.

\* \* \* \* \* \*

For those who deal in laetrile, the amounts of money involved can be very large. Specific counts listed in the San Diego indictment, for example, included bank deposits by two of those indicted totaling more than 1.5 million dollars apiece.

4. Laetrile is a derivative of apricot pits. It is argued that it reduces cancerous growth since cancer cells lack an enzyme, contained in normal cells, which detoxifies cyanide released by Laetrile. Many researchers are not convinced of this or any other beneficial effect. Clearly, it sometimes does give hope to those to whom hope has otherwise been denied.

5. Time, June 7, 1976, at 60. The critical portions include:

Following a year's investigation, a San Diego grand jury indicted [Dr. Ernesto] Contreras and six other Mexicans, one Canadian and eight Americans, as well as three Mexican firms, for peddling the contraband drug in the U.S. through a multimillion-dollar smuggling operation supplying some 10,000 cancer victims a day. It was the biggest crackdown yet against a drug that has a strong and persistent following even though, in the opinion of virtually all U.S. cancer specialists, it offers no real medical benefits.

The key figure in the federal charges appeared to be a shadowy onetime Canadian gunrunner and self-styled philanthropist

This article contained background information on the controversy concerning the use of Laetrile, but was primarily directed toward a discussion of the San Diego grand jury. It noted the indictment of seven Mexicans, one Canadian, and eight Americans as well as three Mexican firms for peddling contraband Laetrile in the United States. The article named two of the Americans who were indicted. Both of those persons were identified as active in the state of California. Schuster and Hanson were indicted in the San Diego investigation, but their names were not mentioned in either the Time or the U. S. News & World Report article.

The importance of journalistic freedom in investigating and reporting on matters of public interest, including public health and welfare and criminal investigations, is unquestioned in our democratic society. The concept of freedom of speech and of the press is constitutionalized in the first amendment proscription of any law prohibiting "freedom of speech, or of the press." Although the first amendment does not immunize the media, including the press, from liability for libelous statements, the Supreme Court has, in the interests of an unfettered press, thought it advisable to restrict the common-law action of libel. In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Court held that actual malice must be proved where public figures claim to have been defamed. This drastic modification of the reach and breadth of common-law libel actions is perceived to be in the public interest and in support of an unfettered press.

The vast expansion in communications has brought with it a proliferation of libel actions that could have a devastating effect on the financial viability of the media and a chilling effect on the presentation of public issues. This has made the public and the courts increasingly aware of the potential harm to the public right to know caused by the common law of libel and slander. Consequently there has been a developing body of constitutional law limiting the potential liability of the news media. Much has been written concerning this development. *See,* e. g., Hill, *Defamation and Privacy Under the First Amendment,* 76 Colum.L.Rev. 1205 (1976); Note, *Defamation, Privacy and the First Amendment,* 1976 Duke L.J. 1016. Others have noted that the changes in the law have resulted in a new common law based on constitutional principles. Frakt, *Defamation Since Gertz v. Robert Welch, Inc.: The Emerging Common Law,* 10 Rut.-Cam.L.J. 519 (1979); *see also* Comment, *The Impending Federalization of Missouri Defamation Law,* 43 Mo.L.Rev. 270 (1978) (excellent discussion of the interrelationship between traditional and constitutional principles in the law of defamation).

Not everyone has viewed the developing constitutional law as an unmixed blessing. Some have noted that journalists sometimes are "essentially insensitive to rights of privacy." H. Simons & J. Califano, The Media and The Law viii (1976). Others have noted that decreasing competition in the media may result in "less incentive to correct mistakes if libel laws are unduly protective of the press." Note, *First Amendment Rights,* 1976 Annual Survey of American Law 501, 555. Whether or not a statement or news article is libelous and actionable rests on state law. In the present case, the District Court determined that under the common law of Minnesota, Schuster and Hanson could not recover. If that holding is correct, we need not consider the application of constitutional protections guaranteed to the press.

---

named Andrew R. L. McNaughton, 59, a friend of Contreras' with links to one of Tijuana's two Laetrile plants. Indicted with Contreras and McNaughton were Robert William Bradford, 45, president of the Committee for Freedom of Choice in Cancer Therapy, a California-based Laetrile-promoting outfit that claims 28,000 U.S. members, Dr. John A.

Richardson, 53, an Albany, Calif., physician who has admitted giving Laetrile to patients, and several health-food distributors. According to the indictment, the conspirators—some of whom piled up bank accounts totaling millions of dollars—used a network of American and Mexican smugglers to get supplies of the drug across the border.

The summary judgment granted by the District Court was in part based on the court's view that under Minnesota law defamation of a large group of persons was not actionable unless it could reasonably be understood to apply to a particular plaintiff. In this case, Hanson and Schuster have admitted that there are hundreds of persons in the United States involved in the sale, distribution, and advocacy of Laetrile.[6] Since there was nothing in the articles reasonably specifying the plaintiffs, they could not recover. The District Court carefully considered and analyzed the applicable Minnesota decisions. *See Fullerton v. Thompson*, 123 Minn. 136, 143 N.W. 260, 263 (1913), *Palmerlee v. Nottage*, 119 Minn. 351, 138 N.W. 312 (1912); *Petsch v. St. Paul Dispatch Printing Co.*, 40 Minn. 291, 41 N.W. 1034 (1889); *Stewart v. Wilson*, 23 Minn. 449 (1877). Our research has not revealed any cases decided by the Minnesota courts relevant to this issue other than those examined by the District Court. In a situation analogous to the present case, the *Stewart* court noted:

> To render a statement or remark of this general character actionable, it must appear to have been used in other than an impersonal sense, and under circumstances raising a reasonable presumption that it had some particular personal allusion and meaning. In this case the article itself discloses no such circumstances,

and, none having been pleaded, the complaint in this regard is fatally defective. *Id.* at 454. The District Court is entitled to deference from us on questions of the law of the state where it sits. In the present case, we are convinced that the District Court correctly held that under Minnesota law the articles referring to sellers and distributors of Laetrile were not of and concerning Hanson and Schuster, as that term is limited by a standard of reasonableness.[7] These vague and general references to a comparatively large group, without mentioning the plaintiffs, do not constitute an actionable defamation.

We also agree with the District Court that under Minnesota law publication of the contents of the San Diego indictments was privileged as fair and accurate reporting of judicial proceedings. *Hurley v. Northwest Publications, Inc.*, 273 F.Supp. 967 (D.Minn.1967), *aff'd*, 398 F.2d 346 (8th Cir. 1968). *See also* Minn.Stat.Ann. § 609.-765 sub'd. 3(4). That privilege was not abused in this case.[8]

Hanson and Schuster contend that this was an inappropriate case for summary disposition in favor of the defendants. We recognize that summary judgment is limited to those cases where there is no genuine issue of material fact and it has been shown that the moving party is entitled to judg-

---

6. The record discloses that plaintiff Schuster testified in a separate proceeding in the District Court that "over one thousand doctors * * in almost every state" refer patients for treatment with Laetrile, that more than 25,000 people use Laetrile, and that Laetrile tablets are or were sold in health food stores in Minnesota and elsewhere.

7. The law of other jurisdictions appears generally to agree with the Minnesota view. *Robinson v. Guy Gannett Publishing Co.*, 297 F.Supp. 722, 726 (D.Me.1969); *Riss & Co. v. Ass'n of Am. Railroads*, 187 F.Supp. 323 (D.D.C.1960); *Schonek v. WJAC, Inc.*, 436 Pa. 78, 258 A.2d 504, 507 (1969); *accord*, Restatement (Second) of Torts § 564A; *see also* 1 A. Hanson, Libel and Related Torts ¶¶ 31–32 (1969); W. Prosser, Handbook of the Law of Torts § 111 (4th ed. 1971).
   *United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc.*, 404 F.2d 706

(9th Cir. 1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), appears to have reached a contrary result insofar as summary judgment was involved on other facts. However, recovery was denied on the basis of a federal privilege for discussion of matters of public health.

8. *Nixon v. Dispatch Printing Co.*, 101 Minn. 309, 112 N.W. 258 (1907), held publication of the contents of the complaint in a civil action was not part of a judicial proceeding and thus not privileged. As the *Hurley* court noted, *Nixon* applies only where a mere filing is involved. Here a grand jury had indicted individuals and criminal proceedings were underway. An indictment is a judicially recognized presentment of charges and thus differs substantially from a unilaterally filed private complaint. In view of the common-law privilege, we have not considered the availability of a constitutional privilege.

ment as a matter of law. *Jackson v. Star Sprinkler Corp. of Florida*, 575 F.2d 1223, 1226 (8th Cir. 1978); Fed.R.Civ.P. 56. However, the Supreme Court has recognized that the cost of defending a protracted lawsuit can chill first amendment rights. *Time, Inc. v. Hill*, 385 U.S. 374, 389, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The courts must keep this harmful effect in mind and grant summary judgment in favor of libel defendants where, on close analysis, it is appropriate under the Federal Rules of Civil Procedure. *See Anderson v. Stanco Sports Library, Inc.*, 542 F.2d 638, 641 (4th Cir. 1976); *accord, Time, Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir.), *cert. denied*, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969). *See also Beatty v. Ellings*, 285 Minn. 293, 299, 173 N.W.2d 12, 16 (1969), *cert. denied*, 398 U.S. 904, 90 S.Ct. 1694, 26 L.Ed.2d 63 (1970).

In the present case the District Court properly granted summary judgment. The alleged libel of the large group of Laetrile distributors and advocates in these two national periodicals could not, as a matter of law, reasonably be understood as being of and concerning Hanson or Schuster. Likewise, the existence and breadth of a privilege concerning reports of judicial proceedings are matters of law appropriate for summary disposition. There are no genuine factual disputes to bar judgment in favor of Time and U. S. News & World Report.

The judgment in favor of defendants Time and U. S. News & World Report is affirmed. Costs are assessed against appellants Schuster and Hanson.

Judgment affirmed.