David PRICE, Plaintiff,

v.

VIKING PRESS, INC., Peter
Matthiessen, Bruce Ellison,
Defendants.

Civ. No. 4–85–819.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 30, 1985.

Daniel P. O'Keefe and Roger Magnuson, Dorsey & Whitney, Minneapolis, Minn., for plaintiff.

Martin Garbus, Frankfurt, Garbus, Klein & Selz, New York City, and Barbara F.L. Penn, St. Paul, Minn., for defendant Viking Press, Inc.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Plaintiff David Price brought this action against Viking Press, Inc. (Viking),[1] Peter

---

1. Viking has been improperly named as "Viking Press, Inc." Its correct name is Viking Penguin, Inc.

Matthiessen, and Bruce Ellison, alleging defamation, intentional infliction of emotional distress, false light invasion of privacy, and prima facie tort. He seeks compensatory damages of $25 million, as well as punitive damages, interest, costs, and attorney's fees. Defendant Ellison has counterclaimed alleging prima facie tort, abuse of process, and violations of 42 U.S.C. § 1985, as well as constitutional violations. Diversity jurisdiction is alleged.[2] The matter is now before the court upon the motion of defendants Viking and Matthiessen to dismiss.[3]

*Background*

This action arises from the book *In the Spirit of Crazy Horse*, written by defendant Matthiessen, allegedly based in whole or in part upon information supplied by defendant Ellison, and published by defendant Viking in 1983. The book addresses, among other things, the role of the Federal Bureau of Investigation (FBI) in the prosecutions arising from the events at Wounded Knee, South Dakota in 1973 and the killing of two FBI agents on the Pine Ridge, South Dakota Reservation in 1975.

Plaintiff's 29 page complaint summarizes the alleged defamatory statements and quotes those portions of the 628 page book that he alleges defame him. He contends that the book accuses him of, among other things, complicity in the murder of an AIM member and in the alleged coverup of that murder, knowingly suborning perjury, violating constitutional rights by illegal investigative and harassment activities, failing to investigate major crimes on Pine Ridge,

and threatening witnesses with physical harm. Plaintiff also alleges that many of the factual assertions in the book are fabrication, that documents and court proceedings are grossly distorted and that the defendants knowingly or recklessly published these falsehoods.

Defendants seek to dismiss the entire action for failure to state a claim upon which relief can be granted.[4] They claim that the complaint does not adequately plead facts establishing malice or actual damages and that the book is privileged under common law. They also claim that the book is not defamatory of Price as a matter of law, that it is absolutely privileged as a neutral report concerning a public official, and that the opinions in the book are not actionable.

*Discussion*

A. Adequacy of the Pleadings

Defendants claim that plaintiff failed to plead facts showing a reckless disregard for the truth. The court has reviewed the various authorities cited by the parties and concludes that the complaint should be considered in terms of Fed.R.Civ.P. 8. *See, e.g., Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir.1980) (in defamation actions, "the pleading of additional evidence is not only unnecessary, but in contravention of proper pleading procedures"). Rule 8 requires only that plaintiff's charges be set forth in a short and concise statement, giving enough detail to enable defendants to respond and to raise the defense of res judicata if appropriate. Examination of plaintiff's 29 page com-

---

**2.** This action was filed in the United States District Court for the District of South Dakota in February of 1984. An identical suit was also filed in South Dakota state court. The federal action was stayed while the state court considered defendants' motion to dismiss. The state court stayed discovery and thereafter dismissed the action for lack of personal jurisdiction. The parties then stipulated to resolve the jurisdictional-venue dispute by agreeing to transfer the federal case to the District of Minnesota. The parties also agreed that the rulings made by the state court in *Price v. Viking Press, Inc.*, Civ. No. 84–448, shall have no force and effect in the transferred federal action.

**3.** Defendant Ellison has not moved for dismissal. A reference to "defendants" will denote Viking and Matthiessen only.

By Order dated October 7, 1985, this court granted defendants' motion to stay discovery pending determination of the instant motion to dismiss.

**4.** Because defendants filed an answer prior to filing their motion to dismiss, the court will treat the motion as one for judgment on the pleadings. *See* Fed.R.Civ.P. 12(b) and (c).

plaint establishes that it satisfies the pleading rules for defamation, even under the more detailed approach advocated by some courts. *See, e.g., Barger v. Playboy Enterprises,* 564 F.Supp. 1151, 1156 (N.D.Cal. 1983), *aff'd* 732 F.2d 163 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 175, 83 L.Ed.2d 110 (1984).

### B. The Substantive Bases for Dismissal of the Defamation Count

Because matters outside the pleadings have been submitted by defendants and considered by the court, defendants' motion shall be treated as one for summary judgment. *See* Fed.R.Civ.P. 12(c). In passing upon such a motion, the court is required to view the facts in a light most favorable to the nonmoving party, and the movant has the burden of establishing that no genuine issue of material fact remains and that the case may be decided as a matter of law. *Buller v. Buechler,* 706 F.2d 844, 846 (8th Cir.1983); *Ralph's Distributing Co. v. AMF, Inc.,* 667 F.2d 670 (8th Cir.1981).

#### 1. The Defamatory Meaning of the Allegations

In libel claims, a publication may be defamatory on its face or it may carry a defamatory meaning only by reason of extrinsic circumstances. Under Minnesota law the court determines whether an alleged defamatory innuendo is reasonably conveyed by the language used. *Utecht v. Shopko Department Store,* 324 N.W.2d 652, 653–654 (Minn.1982); *Marudas v. Odegard,* 215 Minn. 357, 10 N.W.2d 233 (1943). The alleged defamatory passages must be considered in the context of the entire work and the words taken as they are commonly understood. If the words are capable of defamatory meaning, the finder of fact must decide whether they were so understood. *Utecht v. Shopko Department Store,* 324 N.W.2d 652, 654 (Minn.1982).

■ Defendants claim that many of the statements in the complaint are innocuous. The court has carefully reviewed each allegation, as well as examining the book itself, and concludes that allegations 10(p), 10(r),[5] 10(y), 11(c), and 11(h) must be dismissed for, as a matter of law, they cannot be reasonably construed as defaming the plaintiff.[6] Many of the other allegations are reasonably susceptible of a defamatory connotation because they republish defamatory statements made by others. Unless

---

5. The court concludes that this allegation should also be dismissed under the alternate theory that it is protected as a statement of opinion. *See* discussion *infra* on pp. 646–648.

6. These allegations provide as follows.
   10(p) states:
   But Judge Benson, ignoring the cynical exploitation of an incompetent witness in two separate cases, determined that Myrtle Poor Bear's false affidavits, like all the rest of the coerced and fabricated evidence in the Res-Murs trials, were "irrelevant."
   10(r) states:
   Fairly or not, Price had come to personify the most cynical abuses of the FBI's regresssive attitudes towards Indians, . . . .
   10(y) states:
   Pourier, a small light-skinned boy who would have passed for a white anywhere else, sat handcuffed in the car while the agents talked . . . the degree of FBI paranoia about AIM was well demonstrated . . . by the fact that SA Hughes, transporting a small, solitary, handcuffed teenager (Teddy Pourier), asked SA Price to provide an escort in a separate vehicle on the two-hundred-mile round trip to

Rapid City, in case someone decided to set this "terrorist" free.
   11(c) states:
   The large force of sweating, nervous men in new battle fatigues, with their sniper and chemical-warfare teams, their APCs and air support, felt frustrated and foolish; after all the shooting had subsided, all the smoke and gas had blown away, there was only the solitary Indian killed much earlier in the day, lying beside the small green cabin on the bluff. Outraged by what looked like a cold-blooded murder of their comrades, and sickened by the two dead bodies with their shattered faces, already swelling after four hours in the sun and the thick heat, the frustrated men took out their wrath on the ruined cabins.
   11(h) provides:
   On March 1, 1976, a week after Anna Mae was found, Jimmy Eagle's old partner, Hobart Horse, was shot and killed in yet another unsolved murder. In just three years on Pine Ridge Reservation, there had been sixty-three well-documented violent deaths; many more than that, for one reason or another, were never reported.

protected by a privilege, defendants are as liable for republication of a defamatory statement as if they had made the statement themselves. *See, e.g., Cianci v. New Times Publishing Co.,* 639 F.2d 54, 60–61 (2d Cir.1980); W. Prosser, *Handbook of the Law of Torts* § 111 (4th ed. 1971).

a. Group Libel

Defendants claim that several paragraphs of the complaint do not concern Price, but only make general reference to the FBI, a large group, and must be dismissed as well. Plaintiff claims, on the other hand, that the number of FBI agents typically assigned to the Rapid City branch was so small that a reader could reasonably conclude that the charges of misconduct referred to plaintiff individually.

Four Minnesota cases have dealt with the question of whether alleged defamation of a group attaches stigma to a member of the group. Of the three cases which allowed plaintiffs to go forward with their libel action, two turned on the effect of a statute which has been subsequently repealed.[7] *See Palmerlee v. Nottage,* 119 Minn. 351, 138 N.W. 312 (1912); *Petsch v. St. Paul Dispatch Printing Co.,* 40 Minn. 291, 41 N.W. 1034 (1889). Neither opinion discloses the number of persons in the group, but *Palmerlee* involved the board of county commissioners for Dodge County and *Petsch* involved an article about a St. Paul "city hall ring." From these facts, one can assume that the group was few in number. Moreover, the plaintiff in *Petsch* was identified by name and as a lieutenant to the chief of the gang. In the third case, *Fullerton v. Thompson,* 123 Minn. 136, 143 N.W. 260 (1913), one of the nine members of the state board of medical examiners was permitted to bring an action on an article about the board. The court stated that "[t]he publication conveys the meaning clearly that each member of the board participated in whatever was done with the fees collected from physicians moving into

this state and licensed to practice here by the board." The plaintiff was also identified by name in the article.

*Stewart v. Wilson,* 23 Minn. 449 (1877), dealt with a statement of broader impact. The court found that the alleged defamatory statement, "we have not the slightest doubt but there is a good deal of perjury in these numerous cases, and it ought to be shown up" is too general to be actionable. 23 Minn. at 453. It found that the sentence "in and of itself imputes perjury to no particular person." *Id.* Under *Stewart,* a statement defaming a large group will not be actionable by an individual member of the group unless the statement is made in other than an impersonal sense and under circumstances where it could be reasonably understood to apply to that member. *Id.* at 453–54.

All of these cases were decided long before the Supreme Court drastically modified the reach and breadth of common-law libel actions in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This court need not consider the application of any constitutional protections, however, because it finds, as a matter of law, that the allegations in 10(j), 11(a), 11(b), 11(c), 11(d), 11(e), 11(f), 11(h), and 11(i) are not actionable under Minnesota law. To the extent that group libel is still a viable theory, it is not called for upon these facts.

In his complaint, plaintiff alleges that he is one of a small group "of as few as 10 special agents assigned to the Pine Ridge Reservation...." While ten may have been the number of FBI agents "typically assigned" to the Rapid City branch, plaintiff's memorandum p. 28, the court may take judicial notice that the number was not so limited during the time period which the book discusses. In *Wounded Knee Legal Defense/Offense Committee v. Federal Bureau of Investigation,* 507 F.2d 1281 (8th Cir.1974), the Court of Appeals described the situation in Rapid City, South

---

7. *Minn.Stat.* § 544.25 was superseded, effective January 1, 1952, by the Minnesota Rules of Civil Procedure and was repealed in 1974. Under the

statute an allegation that the defamation was of and concerning the plaintiff could withstand demurrer.

Dakota in March, 1973: "At that time the area was replete with F.B.I. agents and federal marshals who had been summoned as a result of the Indian action at Wounded Knee." Media stories from the time period also indicate that the number of FBI agents operating near Rapid City exceeded the number typically assigned.

■ Where the group is not small, a statement defaming it will not be actionable by its members unless the context of publication raises a reasonable presumption of personal allusion. *Stewart v. Wilson,* 23 Minn. 449 (1877); *Schuster v. U.S. News & World Report, Inc.,* 459 F.Supp. 973, 977 (D.Minn.1978), *aff'd,* 602 F.2d 850 (8th Cir. 1979). Even giving Price the benefit of all reasonable inferences, the court finds that the general references to a group of FBI agents or to the FBI itself is not actionable defamation. The allegations in paragraph 11—with the exception of 11(g)—and 10(j) are applicable to others as well as the plaintiff[8] and the book contains no facts or circumstances from which readers might know that plaintiff was the person allegedly defamed.[9] Accordingly, these allegations must be dismissed.

### 2. The Opinion Defense

■ *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) elevated to constitutional principle the distinction between fact and opinion, providing an immunity from defamation actions for all opinions. In widely quoted dicta, the Court stated:

Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we de-

pend for its correction not on the conscience of judges and juries but on the competition of other ideas.

418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007. Distinguishing fact from opinion in a libel case is a duty for the courts. *See Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin,* 418 U.S. 264, 283–84, 94 S.Ct. 2770, 2780–81, 41 L.Ed.2d 745 (1974); *Lauderback v. American Broadcasting Companies,* 741 F.2d 193, 196, n. 6 (8th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985). Where the court determines that the allegedly defamatory statements are opinion and plaintiff cannot cite undisclosed facts which would substantially alter the average reader's interpretation of the opinion, summary judgment is justified. *Lauderback v. American Broadcasting Companies,* 741 F.2d 193, 198 (8th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985).

■ In determining whether a statement is fact or opinion, a court is not constrained "by the semantic nature of the individual assertion ... [but must] turn instead to the totality of the circumstances of the case to determine whether a statement may be actionable." *Ollman v. Evans,* 750 F.2d 970, 1001–02 (D.C.Cir.1984) (*en banc*) (Bork, J. concurring), *cert. denied,* — U.S. —, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).[10] Several factors are relevant in assessing whether the average reader would view the statement as fact or opinion.

■ First, the language of the statement must be analyzed to see whether the statement is sufficiently precise for readers to believe that they are reading an assertion

---

**8.** Not only are the allegations applicable to other FBI agents in the Rapid City area, but 11(b) can be read as referring to FBI behavior on other reservations located in other areas. Dino Butler in 11(b) is speaking about the stories that go out from the "reservations" and FBI behavior when "AIM gathers." AIM gatherings took place all over the country.

**9.** Under the analysis of *Fullerton v. Thompson,* 123 Minn. 136, 143 N.W. 260 (1913), alleged defamatory statements which are aimed at only a part of a group may not be actionable. *Ac-*

*cord,* W. Prosser, *Handbook of the Law of Torts,* § 111 at 750, 751 (4th ed. 1971). 11(e) refers to only 2 FBI agents and 11(i) refers to 6 agents; under these circumstances, a reader would have no reason to conclude that the finger of defamation is pointed at Price specifically.

**10.** This language and totality of circumstances approach was quoted favorably in *Janklow v. Newsweek, Inc.,* 759 F.2d 644 (8th Cir.1985), *reh'g granted* (rehearing *en banc* to consider the panel's reversal of the district court's dismissal based on the opinion defense).

of fact, or whether it is ambiguous. *Id.* at 979–981. A primary example of a precise statement is a specific accusation of a crime. *See Cianci v. New Times Publishing Co.,* 639 F.2d 54, 63 (2d Cir.1980) (article implying that Mayor of Providence, R.I. had committed rape and paid the alleged victim not to bring charges was not protected opinion).[11] "Broad brush-stroked references to unethical conduct," on the other hand, may be understood by the reasonable reader as opinion even though terms normally understood to impute specific criminal acts were used. *Lauderback v. American Broadcasting Companies,* 741 F.2d 193, 197 (8th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985); *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 LEd.2d 745 (1974) (use of term "traitor" understood to imply no specific criminal conduct).

Second, is the statement objectively capable of proof or disproof? A reader cannot reasonably view an unverifiable statement as conveying actual facts. *E.g. Ollman v. Evans,* 750 F.2d 970, 981 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

Third, moving from the challenged language itself, the court should consider the full context of the statements, including any cautionary or interrogative language found in the text. *Id.* at 982–83.

Fourth, the forum or the nature of the publication should be examined, for certain types of writing signal to readers that what is being read is opinion. *Id.* at 983.[12]

Finally, the court should consider whether the opinion implies the existence of undisclosed facts as the basis for the opinion.

*See* Restatement (Second) of Torts § 566; *Lauderback v. American Broadcasting Companies,* 741 F.2d 193, 195–96 (8th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985). Those statements which do are unprotected. *Id.*

While these factors assist a court in accommodating the competing interests in free expression and in an individual's reputation, they do not provide a bright-line distinction between assertions of fact and expressions of opinion. Courts are universally agreed that the task of separating opinion from fact is a difficult one. *See, e.g., Rinsley v. Brandt,* 700 F.2d 1304, 1309 (10th Cir.1983). In the instant case where the alleged defamatory statements are culled from a lengthy book rather than a short article, the task is even more arduous.

Plaintiff asserts that the book is held out to be a highly detailed factual account which leads readers to assume the conclusions about the plaintiff are factual in nature. To be sure, the book is a detailed account of events which occurred on the Pine Ridge Reservation in the 1970s. Each chapter contains numerous footnotes referring to various sources. From the dedication on, however, the average reader would have reason to believe that Matthiessen is attempting to present opinions and beliefs he identifies with American Indian people.[13] The author prefaces every chapter by quotes from Indians and much of the narration is told in the Indians' own voices. Moreover, the author candidly states in several places that he "openly argues the position of traditional Indian people and their allies in the American Indian Movement." Matthiessen, *In the Spirit of Crazy Horse,* 460 (1983). *See also* p. 576.

---

**11.** The court in *Cianci* declared that although a pejorative statement of opinion concerning a public figure is generally protected, this principle does not cover a charge which could be reasonably understood as "imputing specific criminal or other wrongful acts." 639 F.2d at 64.

**12.** In his dissent in *Janklow v. Newsweek, Inc.,* 759 F.2d 644, 656–57 (8th Cir.1985), *reh'g granted,* Judge Arnold states it is important to consider

whether the alleged defamatory statements criticize the motives or intentions of a public official; such criticism is vital to our form of government and lies at the heart of the First Amendment.

**13.** The dedication states: "For all who honor and defend those people who still seek to live in the wisdom of Indian way."

In addition, many of the allegedly defamatory statements are couched in cautionary language and some are rhetorical questions.[14] While cautionary language may not immunize a defamatory statement which is as factually laden as the specific accusation of a crime, *see Cianci v. New Times Publishing Co.*, 639 F.2d 54, 63 (2d Cir.1980), in statements less clearly factual, it may substantially affect the reader's understanding. *Ollman v. Evans*, 750 F.2d 970, 983 (D.C.Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Such language may militate in favor of treating statements as opinions. Furthermore, because the author presents plaintiff's side of the story, including his recognition of the accusations against him and his outright denials of these charges, the average reader might be aware that some of the alleged defamatory statements merely reflect the beliefs of one side of the participants in a bitter controversy.

Notwithstanding the general context of these allegations and the cautionary language, the court finds that few of the alleged defamatory statements may be characterized as opinion at this time. Because the dividing line between fact or opinion is somewhat blurred, the court will not attempt to draw a definitive line at this stage of the proceedings. Where the alleged defamatory statement does not clearly fit into either category, the court will not foreclose the plaintiff from proceeding with discovery.

■ The alleged defamatory statements in 10(e), 10(h), and 10(r), however, are constitutionally protected opinion. 10(e) refers to an opinion expressed by Dr. Muldrow of the Civil Rights Commission that the FBI agents were "deeply upset" by the "execution of their comrades." Matthiesson, *In the Spirit of Crazy Horse*, p. 198 (1983). The author then "imagined" the outrage

felt by FBI agents including Price, who apparently participated in the crime-scene investigation, and states that "these men can be excused for vengeful feelings, if not for the pattern of activities that follow." *Id.* The "pattern of activities" referred to in 10(e) is simply too broad and unfocused to be reasonably understood as imputing specific criminal conduct. Similarly, the statements in 10(h) and 10(r) that Price "is content to manipulate people" and that he has "come to personify the most cynical abuses of the FBI's regressive attitudes towards Indians", *id.* at 266 and 460 respectively, are too imprecise and loosely definable to impute specific criminal acts. Since the statements may not be proved or disproved, a reader cannot reasonably view them as conveying actual facts. Because these statements are expressions of opinion, the claims based on them should be dismissed.

### 3. The Neutral Reportage Defense

Defendants contend that they are shielded from liability by the Second Circuit's neutral reportage privilege first stated in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).[15] As outlined in *Edwards*, the privilege protects from libel liability the accurate and disinterested reporting of serious charges against a public figure made by a responsible, prominent organization regardless of the validity of the charges. *Id.* at 120. Some courts have expanded the privilege to "all republications of serious charges made by one participant in an existing public controversy against another participant in that controversy, regardless of the 'trustworthiness' of the original defamer". *Barry v. Time*, 584 F.Supp. 1110 (N.D.Ca.1984). The purpose of the privi-

---

14. The following are examples of cautionary language used in the book:

"Alleged", "disputed" (Cplt. ¶ 10(b)), "according to" (Cplt. ¶ 10e)), "reportedly" (Cplt. ¶ 10(f)), "suspicion" (Cplt. ¶ 10(i)), "suggestions" (Cplt. 10(m)), "the defense declared" (Cplt. ¶ 10(n)), "one can fairly assume" (Cplt.

¶ 10(q)), "[f]airly or not" (Cplt. ¶ 10(r)), "speculations" (Cplt. 10(s)), "it is now believed" (Cplt. ¶ 10(x)). ¶ 10(f) uses rhetorical questions.

15. The Eighth Circuit has not yet addressed the neutral reportage privilege.

lege is to promote "[t]he public interest in being fully informed about controversies that often rage around sensitive issues." *Edwards v. National Audubon Society, Inc.*, 556 F.2d at 120.

Defendants claim that Price is clearly a public figure and that the court may take judicial notice of the court decisions, media stories and books about the events arising from the Wounded Knee occupation and the killing of the FBI agents to find that the author is reporting on an existing controversy with accuracy and a fair degree of editorial balance. Plaintiff, by contrast, asserts that the neutral reportage privilege should be rejected because Matthiesson did not report the allegations in a neutral fashion and that factual issues preclude dismissal.

▆▆▆▆ The court need not discuss whether the neutral reportage privilege should be employed in this circuit, however, because the privilege may not be properly applied at this point. As noted in *Cianci v. New Times Publishing Co.*, 639 F.2d 54, 68 (2d Cir.1980), the privilege is limited in scope and requires careful examination of the facts in each case. No discovery has occurred in the instant case, and factual issues remain concerning the application of the privilege. Even though plaintiff is a public official involved in a particular public controversy (*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Gray v. Udevitz*, 656 F.2d 588 (10th Cir.1981)), the neutral reportage privilege requires that charges by third parties be accurately reported. At this point, the court cannot determine whether the republications are accurate. Nor can the court tell at this stage whether the accusations come from prominent or responsible third parties. Accordingly, the court could not now find that the neutral reportage privilege justifies dismissal of the allegations in the complaint.

### 4. The *New York Times v. Sullivan* Actual Malice Privilege

Another defense relied upon by defendants is the qualified *New York Times v.*

*Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), actual malice privilege. This constitutional privilege protects the media from defamation suits by public figures, unless the media defendant published the defamatory accounts with knowledge of their falsity or in reckless disregard for the truth. Defendants claim that the book and the public record are sufficient to establish that Price cannot meet his burden of proving with convincing clarity that anything in the book was published with reckless disregard for the truth. In particular, Viking argues that it properly relied upon Matthiessen's well-established reputation and the depth of his research.

▆▆▆▆ After carefully reviewing the public record, the court concludes that dismissal based on the actual malice privilege cannot be granted at this time before any discovery has taken place. Application of this privilege calls into question a defendant's state of mind and may not lend itself to summary disposition. *See Hutchinson v. Proxmire*, 443 U.S. 111, 120, n. 9, 99 S.Ct. 2675, 2680, n. 9, 61 L.Ed.2d 411 (1979). The public record in this case may support defendants' position concerning certain events, but other events which defendants discuss are not mentioned in public proceedings. The court cannot now rule that the issue of malice may be decided as a matter of law. Where liability is not foreclosed by some other privilege, a plaintiff in a defamation suit is entitled to discovery on the malice issue. *See, e.g., Herbert v. Lando*, 441 U.S. 153, 176–177, 99 S.Ct. 1635, 1648–49, 60 L.Ed.2d 115 (1979).

### 5. Common Law Privilege

▆▆▆▆ Defendants contend that dismissal is appropriate because the alleged defamatory statements are protected by the qualified common law privileges allowing one to comment on the conduct of public officials, to make statements in the public interest, and to report on judicial proceedings. Even after examining the court decisions to

which defendants refer,[16] the court cannot conclude as a matter of law that the book accurately and fairly reports the underlying court proceedings.[17] Furthermore, the other qualified privilege could be defeated if defendants published the defamatory statement with malice, *i.e.* in bad faith, recklessly, or out of ill will or improper motive. *See generally* Note, *Minnesota Defamation Law and the Constitution*, 3 Wm. Mitchell L.Rev. 81, 87 (1977). Such a determination depends upon further discovery. *Cf. Utecht v. Shopko Department Store*, 324 N.W.2d 652, 654 (Minn.1982).

### 6. Damages

Defendants claim that the complaint should be dismissed because plaintiff has suffered no actual damages. It is well-established, however, that proof of recklessness justifies a presumption of damages even absent proof of actual injury. *See, e.g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Because the court has found that plaintiff is a public official, and because public officials may not recover unless a showing of recklessness or conscious disregard of the truth is made, plaintiff need not have pled out-of-pocket damages. Dismissal is thus inappropriate.

### C. Intentional Infliction of Emotional Distress

Plaintiff alleges that false statements in the book and the publication of the city in which plaintiff lives are intentional inflictions of emotional distress. Plaintiff emphasizes that publication of his city encourages violent individuals to consider physically harming him or his family. Defendants claim that the publication of public information fails to state a claim under common or constitutional law.

The tort of intentional infliction of emotional distress is narrow in scope and limited to cases involving particularly egregious facts. It is unavailable unless a defendant intentionally or recklessly caused severe emotional distress by extreme and outrageous conduct. *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428 (Minn.1983). The conduct at issue must be "utterly intolerable in a civilized society." *Id.* at 440, quoting Restatement (Second) of Torts, § 46, Comment d (1965). It is for the court to determine in the first instance whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. Restatement (Second) of Torts, § 46, Comment h (1965).

In this case, based on publicly available information that plaintiff was assigned to a certain city, defendant Matthiesson called the telephone information service in that city and located plaintiff. Defendants' publication of the city's name where plaintiff and his family were located does not, as a matter of law, rise to the level of outrageous activity required to allege this cause of action. *See id.; see also Ross v. Burns*, 612 F.2d 271 (6th Cir.1980) (publication of photograph of undercover police officer as well as his name in news article describing activities of "undercover narcs" did not state a claim for intentional infliction of emotional distress).

Nor are the alleged defamatory statements so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. Minnesota cases which have allowed recovery for intentional infliction of emotional distress have involved such extreme acts as mutilating a corpse,[18] embalming a body without the relatives permission,[19] or threatening a

---

16. *United States v. Banks*, 374 F.Supp. 321 (D.S.D.1974); *United States v. Banks*, 383 F.Supp. 389 (D.S.D.1974); *Wounded Knee Legal Defense/Offense Committee (WKLDOC) v. The Federal Bureau of Investigation*, 507 F.2d 1281 (8th Cir. 1974); *Richard Marshall v. State*, 305 N.W.2d 838 (S.D.1981).

17. The defendants did not supply the court with transcripts of the proceedings.

18. *Larson v. Chase*, 47 Minn. 307, 50 N.W. 238 (1891).

19. *Sworski v. Simons*, 208 Minn. 201, 293 N.W. 309 (1940).

school girl with prison and public disgrace unless she signed a confession of immoral conduct.[20] The court has found no Minnesota case which discusses whether allegedly false statements made against a public official may state a cause of action for intentional infliction of emotional distress. While some defamatory statements may be so outrageous as to state a cause of action under certain circumstances, the alleged defamatory statements made against Price, a public official, in the context of Matthiessen's entire book, are not, as a matter of law, utterly intolerable in a civilized society. Thus, plaintiff's cause of action based on this tort must be dismissed.

### D. False Light Invasion of Privacy

Defendants claim that this count should be dismissed because plaintiff cannot show that they published the book with knowledge of its falsity or in reckless disregard for the truth. They also claim that the tort of invasion of privacy has never been recognized in Minnesota. Plaintiff did not argue that the tort is recognized, or even that it should be.

Plaintiff's claim for invasion of privacy must be determined under Minnesota law. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Minnesota has never recognized a cause of action for invasion of privacy in general or for invasion by false light in particular. *See Hendry v. Conner*, 303 Minn. 317, 319, 226 N.W.2d 921, 923 (1975); *House v. Sports Films*, 351 N.W.2d 684, 685 (Minn. App.1984). It is not for a federal court to recognize it in the first instance, especially when plaintiff has an alternative theory on which to proceed. Thus, count III should be dismissed.

### E. Prima Facie Tort

Defendants claim that this count is defective because Minnesota does not recognize the concept of prima facie tort, and even if it does, the doctrine is inapplicable here. The court has found no case where Minnesota has accepted the doctrine of pri-

ma facie tort. Even assuming that the Minnesota courts would recognize such a remedy, the court concludes that the doctrine is only applicable when the factual basis of the complaint does not fall within the parameters of an established tort. *See* Restatement (Second) of Torts, § 871, Comments a & d (1979); *see also Tufts v. Madesco Investment Corp.*, 524 F.Supp. 484 (E.D.Mo.1981). In the instant case, plaintiffs have a cause of action in defamation. Consequently, Count IV must be dismissed.

### ORDER

Accordingly, based upon the above and all the files, records, and proceedings herein,

IT IS HEREBY ORDERED that

1. Defendants' motion for summary judgment is granted with respect to Counts II, III, and IV, as well as allegations 10(e), 10(h), 10(j), 10(p), 10(r), 10(y), 11(a), 11(b), 11(c), 11(d), 11(e), 11(f), 11(h), and 11(i), and all of these allegations are dismissed.

2. Defendants' motion for summary judgment is denied in all other respects.

3. The order staying discovery is vacated.

LET JUDGMENT BE ENTERED ACCORDINGLY.

**20.** *Johnson v. Sampson,* 167 Minn. 203, 208    N.W. 814 (1926).