Stephen F. **CONROY**, Plaintiff,

v.

**Lou KILZER, Chris Ison, and Cowles Media Company, Defendants.**

**No. Civ. 4–91–132.**

United States District Court, D. Minnesota, Fourth Division.

April 20, 1992.

Earl P. Gray, Richard J. Malacko, St. Paul, Minn., for plaintiff.

John P. Borger, W. James Fitzmaurice, Faegre & Benson (Randy Miller Lebedoff, Vice President, of counsel), Star Tribune Legal Dept., Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motion for partial summary judgment. The motion will be granted.

## FACTS

This is an action for defamation and intentional infliction of emotional distress[1] by the former St. Paul fire chief against the Minneapolis Star Tribune and two of its reporters arising out of two articles published in October 1989 concerning the role of the fire chief and the St. Paul Fire Department in investigating arson cases in St. Paul, and one article published in December 1989 concerning former St. Paul Mayor George Latimer.

Plaintiff's original complaint stated his libel claim in broad terms, alleging that the articles contained defamatory implications, opinions, and innuendo. Compl. ¶ XII–XIV. Defendants moved for dismissal or for more definite statement, arguing that Minnesota law required plaintiff to specify the defamatory statements upon which he relied. In a May 1991 order, the Court gave plaintiff thirty days in which to submit a more definite amended complaint. Plaintiff filed his amended complaint on June 12, 1991. In his amended complaint, plaintiff specified numerous statements which he claims are false and defamatory. Am.Compl. ¶ XIII, XV. He also retained, however, the paragraphs to which defendants objected in their motion to dismiss. Those paragraphs state that "defendants prepared, composed and caused to be published certain articles in the Star Tribune containing false and defamatory matter that by implication, opinion and innuendo accused plaintiff Conroy of being involved with a culture of arson." Am.Compl. ¶ XII, XIV, XVI.

Defendants now move for summary judgment on the claim for intentional infliction of emotional distress and for partial summary judgment on the defamation claim. They assert that Minnesota does not allow a public official to recover damages for libel by implication, and that paragraphs XII, XIV, and XVI should therefore be stricken from the complaint. Defendants also move for dismissal of the portion of the libel claim relating to a December 26, 1989 article entitled "The Latimer Legacy," on the grounds that plaintiff has failed to specify the defamatory statements in the article, as the Court's May 1991 order required him to do. Finally, defendants move for summary judgment on certain statements specified in the complaint as defamatory, on the grounds that the statements are true, are not "of and concerning" plaintiff, or are fair reports of the contents of official records. Plaintiff concedes to these arguments with respect to some of the statements, and agrees that the following statements should be stricken from the amended complaint: paragraph XIII, subdivisions (e), (h) (first clause), (f), (k) (last two sentences), (n), (q), (s), (t), (u), (aa), (cc), (ee), and (ff); paragraph XV, subdivision (e).

## DISCUSSION

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91

---

1. Plaintiff's original complaint also raised a claim for punitive damages; in May 1991, the Court dismissed this claim without prejudice.

L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing*, 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## I. *Libel by Implication*

As noted above, paragraphs XII, XIV, and XVI of plaintiff's amended complaint refer to "false and defamatory matter that by implication, opinion and innuendo accused plaintiff Conroy of being involved with a culture of arson." Defendants argue that these paragraphs must be stricken from the complaint because under Minnesota law, a public official plaintiff may not bring an action for libel by implication against a media defendant. Defendants base this argument primarily upon *Diesen v. Hessburg*, 455 N.W.2d 446 (Minn. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991).

In *Diesen,* a county attorney brought suit against a newspaper, alleging that the newspaper libeled him by publishing articles that implied that the plaintiff was ov-

erly lenient in prosecuting men who battered women. A jury found that the articles contained implications that were substantially false and awarded the plaintiff compensatory and punitive damages. The trial court granted the defendant a judgment notwithstanding the verdict, holding that a libel action by a public official cannot be based on false implications arising from true facts. The Minnesota Court of Appeals reversed and reinstated the jury's verdict.

The Minnesota Supreme Court reversed the ruling of the court of appeals. In a plurality opinion, three justices concluded that where the challenged statements are true, a public official may not prove falsity by implication. *Id.* at 451. The plurality reasoned that truth is a complete defense to defamation and that allowing public officials to sue for false implications arising from true statements would inhibit the publication of opinions and fair comment regarding public officials. Such an inhibition would undermine the freedom to criticize public officials, a freedom deemed essential to our form of government. *Id.* at 451–52. Two justices concurred in the plurality's reversal of the court of appeals ruling, but based their decisions on different grounds. The remaining two justices dissented.

Given the fragmentation of the *Diesen* court, it is difficult to state with certainty Minnesota's rule regarding libel by implication. Defendants correctly note, however, that numerous other jurisdictions have, like the *Diesen* plurality, rejected suits by public officials based on false implications arising from true statements. *See, e.g., Pierce v. Capital Cities Communication, Inc.,* 576 F.2d 495, 504 (3d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978), *Schaefer v. Lynch,* 406 So.2d 185, 188 (La.1981), *Mihalik v. Duprey,* 11 Mass. App.Ct. 602, 417 N.E.2d 1238 (1981), *Strada v. Connecticut Newspapers, Inc.,* 193 Conn. 313, 477 A.2d 1005, 1010 (1984).

In any event, this case does not require the Court to determine whether a public official plaintiff in this jurisdiction may claim libel by implication arising from true

statements, because plaintiff does not urge this Court to reject the rule adopted by the *Diesen* plurality. Rather, he argues that the *Diesen* rule is not applicable to this case because in *Diesen*, the statements giving rise to the allegedly defamatory implication were true. In this case, plaintiff asserts, it was the defendants' *false* statements that gave rise to a defamatory implication, and therefore *Diesen* does not control.

Plaintiff asserts that this case is actually controlled by *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), in which the United States Supreme Court held that statements of opinion were not necessarily entitled to constitutional protection. The Court developed a two-part test to determine which statements of opinion were entitled to protection and which were not. Under that test, a court must first determine whether a reasonable fact finder could conclude that a statement implied a defamatory assertion; if so, the court must then determine whether the defamatory assertion is sufficiently factual to be susceptible of being proved true or false. *Milkovich*, 110 S.Ct. at 2707. If the defamatory assertion implied in the statement of opinion cannot be proved true or false, the statement is constitutionally privileged.

Plaintiff argues that a reasonable factfinder could conclude that the headlines and articles at issue in this case implied a defamatory assertion and that the first prong of the *Milkovich* test is therefore satisfied; plaintiff does not address the second prong of the *Milkovich* test. In any event, however, *Milkovich* does not resolve the issue raised in defendants' motion. The *Milkovich* test establishes when a statement of opinion constitutes 'privileged speech under the First Amendment; thus, it does not establish a test for defamation by implication, but merely sets the constitutional parameters that limit defamation suits. Defendants have not argued that the statements or implications that plaintiff challenges are constitutionally privileged; rather, they assert that the claims raised in paragraphs XII, XIV, and XVI of plaintiff's complaint are barred by Minnesota's common law of defamation. The issue before the Court, then, is whether, under Minnesota law, plaintiff can raise claims based on false implications arising from false statements. The Court concludes that he cannot.

■ As a technical matter, it does not appear that plaintiff has pled a cause of action for libel by implication.[2] The *Diesen* plurality viewed libel by implication as occurring, by definition, where false implications arise from true statements of fact. It took this definition from Prosser, who notes that "if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, he may be held responsible for the defamatory publication ... even though the particular facts are correct." Prosser & Keeton on the Law of Torts § 116 (Supp.1988) (citations omitted). Thus, Prosser sees the tort of libel by implication as applying to a situation where true statements have been manipulated, omitted, or artificially juxtaposed to create untrue implications.

The conclusion that only true statements may give rise to a libel by implication action is bolstered by the reported cases involving a libel by implication theory. The parties have cited, and the Court has locat-

---

2. Nor has plaintiff pled "innuendo," as that term is applied in defamation law. Although the term "innuendo" is sometimes used loosely as a synonym for insinuations or implications arising from the literal language used in a statement, it also carries a precise and technical meaning in defamation law. In cases in which a statement is not defamatory on its face, but takes on a defamatory meaning because of extrinsic facts, plaintiffs are required to plead both the extrinsic facts and the defamatory meaning that arose from the combination of those facts and the statement. The extrinsic facts are known as the inducement, and the defamatory meaning as the innuendo. *See, e.g., Anderson v. Kammeier*, 262 N.W.2d 366, 371 (Minn.1977); *Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 504 n. 7, *cert. denied*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978); Restatement (Second) of Torts § 563 comment f (1977). Plaintiff has not alleged that statements not defamatory on their face carried a defamatory meaning because of extrinsic facts.

ed, no case in which libel by implication was applied to a fact pattern involving false statements. Rather, the theory has been used in cases involving allegations that true statements gave rise to false implications or allegations that facts were omitted that, if included, would have changed the implication of the statement. *See, e.g., White v. Fraternal Order of Police*, 909 F.2d 512 (D.C.Cir.1990); *Davis v. Sears, Roebuck and Co.*, 873 F.2d 888 (6th Cir.1989). Moreover, if a claim is based on false statements, there seems to be no reason to invoke the tort of libel by implication: the plaintiff may sue under a straight libel theory.

 Under a libel theory, plaintiff must show, among other things, that defendants made statements that were false and defamatory. In determining whether a statement is defamatory, the issue is whether an ordinary person would understand the statement as defamatory. *Rose v. Koch*, 278 Minn. 235, 154 N.W.2d 409, 417 n. 12 (1967). Thus, the language must be construed as it is ordinarily understood, and words must be given their obvious and natural meaning. *Jones v. Monico*, 276 Minn. 371, 150 N.W.2d 213, 215 (1967); *Jadwin v. Minneapolis Star and Tribune Co.*, 390 N.W.2d 437, 442 (Minn.Ct.App. 1986). Once it is determined that a statement is capable of carrying a defamatory meaning, the question of whether the statement's recipient in fact understood it to be defamatory is for the jury. Restatement (Second) of Torts § 614 (1977).

 Under these standards, plaintiff's reliance on the implications arising from false statements is impermissible for two reasons. First, because plaintiff seeks recovery from media defendants, plaintiff bears the burden of proving that defendants made false statements; if plaintiff were allowed to base recovery on his own interpretations of defendants' statements, rather than on the statements they actually made, defendants could be held liable for statements that they did not make. Holding media defendants liable for statements

they did not make raises serious first amendment concerns. Second, it is the jury's function to determine whether defendants' statements, given their obvious and natural meaning, were understood by their recipients to be defamatory. The jury's interpretation of defendants' statements controls, and plaintiff cannot be allowed to dictate to the jury the meaning it should take from the statements. Because plaintiff's allegations of false implications are an attempt to hold defendants' liable for statements they did not make, and because the allegations impermissibly invade the province of the jury, the Court will grant defendants' motion to strike paragraphs XII, XIV, and XVI[3] from the amended complaint.

## II. *"The Latimer Legacy"*

 Paragraph XVI of the amended complaint alleges that defendants prepared and published an article entitled "The Latimer Legacy" that "incorporate[s] the falsehoods" of two earlier articles and that "by implication, opinion and innuendo accused plaintiff Conroy of being involved with a culture of arson." Paragraphs XX and XXI allege that plaintiff asked defendants to retract the defamatory matter in "The Latimer Legacy" and that defendants refused to do so. Defendants argue that the Court should strike these paragraphs from the complaint, for two reasons: first, despite the Court's May 1991 order, plaintiff has not specified the particular defamatory statements upon which he relies; second, the article contains no references that connect plaintiff to arson.

In response, plaintiff admits that "The Latimer Legacy" contains no statements of false and defamatory matter and states that the focus of plaintiff's cause of action is the defamatory matter contained in the articles of October 29, 1989 and October 30, 1989. He asserts, however, that the allegations regarding "The Latimer Legacy" should not be dismissed because they "resurrected the lies about plaintiff and his ties to arson." Pl.'s Mem. at 7–8.

---

**3.** Defendants also move to dismiss the allegations in paragraph XVI on the grounds that they are insufficiently specific. This argument is considered below.

As defendants note, plaintiff does not explain the way in which "The Latimer Legacy" resurrected the earlier statements about plaintiff and his ties to arson. "The Latimer Legacy" primarily concerns former St. Paul Mayor George Latimer; it mentions plaintiff only twice. The first reference to plaintiff is a statement that Latimer "could push hard for new businesses and jobs, but back away from disciplining a fire chief embroiled in embarrassing controversies." "The Latimer Legacy," attached as Ex. A to Def.'s Mem. Supp. Mot. to Dismiss. The article does not state the embarrassing controversies to which it refers. The second reference to plaintiff is a statement that questions had "surfaced about Latimer's ability to oversee his fire and licensing departments.... His fire chief has been criticized for hiring on-duty fire employees to do repair work on his Hudson, Wis., home and for his failure to take a leadership role on establishing an affirmative action plan in his department." *Id.*

Because "The Latimer Legacy" does not mention arson, let alone connect it to plaintiff, it is difficult to see how the statements concerning plaintiff can be seen as resurrecting the falsehoods of the earlier articles. Although plaintiff does not say so, it appears that he reads the reference to "embarrassing controversies" to refer to the alleged links to arson raised in the earlier articles. Nothing in "The Latimer Legacy," however, connects the "embarrassing controversies" to arson; rather, the controversies mentioned in the article relate to plaintiff's use of fire department employees and his role in affirmative action programs. Moreover, "The Latimer Legacy" was published December 26, 1989, almost two months after the two articles relating to arson; linking a statement about embarrassing (but unnamed) controversies to issues raised in articles that appeared two months earlier is tenuous at best. Because plaintiff's only claim is that "The Latimer Legacy" resurrected the falsehoods on which he rests his libel action, and because the Court sees no connection between "The Latimer Legacy" and the earlier articles about arson, the Court will grant summary

judgment for defendants on the allegations regarding "The Latimer Legacy."

### III. Statements Privileged as Fair Reports of Official Records

The parties agree that newspapers have a qualified privilege that shields them from liability for libel when they make fair and substantially accurate reports of public proceedings and the contents of public records. *Jadwin v. Minneapolis Star and Tribune Co.,* 390 N.W.2d 437, 441 (Minn. Ct.App.1986); *Schuster v. U.S. News & World Report, Inc.,* 459 F.Supp. 973, 978 (D.Minn.1978), *aff'd,* 602 F.2d 850, 854 (8th Cir.1979) (citing Restatement (Second) of Torts § 611 (1977)). The parties dispute, however, whether several statements made in the October articles are fair and accurate reports of public records. Each of these statements will be considered in turn.

#### A. Amended Complaint, Paragraph XIII(*o*)

■ The statement objected to in this paragraph is as follows:

> According to a police memorandum, Latimer first said that the investigation should proceed. But it soon died amid a political storm in 1979, with the most serious allegations against Chief Conroy never being made public. Latimer said that he cannot recall if he ever asked his Chief about the allegations.

Am.Compl. ¶ XIII(*o*).

Defendants assert that the first sentence of this passage closely tracks the language of an August 16, 1978 police memorandum, which states that the police chief informed Mayor Latimer that serious allegations had arisen regarding plaintiff and that "Latimer agreed that these allegations were of a more serious nature than a hidden ownership in a bar, and urged the [police chief] to explore them." Affidavit of Chris Ison Ex. B. As to the remaining two sentences of the passage, defendants assert that the statements are true, and that even if they were false, that falsity would constitute no injury to plaintiff because the statements do not defame him. In response, plaintiff

argues that the first sentence of the passage is not a fair and substantially accurate representation of the police report, and that the remaining two sentences, while not actionable on their fact, carry a false implication that plaintiff was involved in a cover-up.

The Court concludes that the first sentence of the passage accurately reflects the statement in the police report that Mayor Latimer urged the police chief to explore the allegations that had arisen concerning plaintiff. The Court further concludes that the remaining two sentences do not defame plaintiff; even if the sentences were read to imply a cover-up, they do not suggest that plaintiff was involved in it. Therefore, the Court will grant defendants' motion to strike paragraph XIII(o) from the amended complaint.

B. Amended Complaint, Paragraph XIII(bb)

■ The statement objected to in this paragraph is as follows:

> [What the public knew at the time was that the investigation was into hidden bar ownerships. But Latimer was told that the] investigation in Steve Conroy's case had gone far beyond that. What it concerned, Chief Rowan explained, was arson.

Am.Compl. ¶ XIII(bb).[4]

Defendants assert that the statement that the investigation in Steve Conroy's case concerned arson is a fair and accurate report of the August 16, 1978 police report, which stated that

> the Chief told Latimer that much more serious allegations had been brought up against Conroy. For example, several bars that experienced arson fires allegedly were linked to or financed by Steve Conroy; that Conroy had loaned fire adjuster BILLY WHELAN $10,000 to start his adjusting business; that JOHN PHAFF, a Conroy associate, and co-owner of a Vail, Colorado, condominium allegedly had an arson at 137½ University Avenue; and that furthermore, Conroy allegedly knew that Phaff was a convicted felon in New Jersey.

> Latimer agreed that these allegations were of a more serious nature than a hidden ownership in a bar, and urged the Chief to explore them.

Ison Aff.Ex. B. Plaintiff asserts that the challenged statement is not a fair paraphrase of the police report, because the statement "flat out says that plaintiff was investigated because of his involvement in arson." Pl.'s Mem. at 4.

The Court concludes that defendants' statement that the investigation of plaintiff "concerned arson" fairly summarizes the statements in the police report that Conroy allegedly had links to several bars that had had arson fires. Therefore, the Court will grant defendants' motion to strike paragraph XIII(bb) from the amended complaint.

C. Amended Complaint, Paragraph XIII(dd)

■ The statement objected to in this paragraph is as follows: "[Overall, various sources had claimed that] four bars in which Conroy allegedly had investments at one time had burned." Am.Compl. ¶ XIII(dd). In support of their motion to strike this portion of the complaint, defendants submit the following public records:

1. The August 16, 1978 police report stating that "several bars that experienced arson fires allegedly were linked to or financed by Steve Conroy." Ison Aff.Ex. B.

2. An August 14, 1978 St. Paul Police Vice Unit Report stating that confidential source S–203 "said he once had a conversation with [public fire adjustor Billy Whelan] about the fire that destroyed Blackie Landreville's Showboat. 203 said the fire was a set arson, and that Whelan alluded to

---

**4.** In some instances, the amended complaint cites relatively small portions of sentences and paragraphs from the article. Where the context of the challenged statement is helpful in determining whether the statement fairly summarizes the public record, larger portions of the article have been quoted. The portions of the article that are not cited in the amended complaint are enclosed in brackets.

that [sic] fact that Conroy was a hidden owner at the club." *Id.* Ex. C.

3. A December 23, 1983 Minnesota Bureau of Criminal Apprehension (MBCA) report summarizing statements by confidential source X–998 about conversations with St. Paul bar owner Walter Montpetit. The report states:

> X–998 said that Montpetit told a long story about how the Landreville's [sic] and Fire Chief Conroy were partners in a nightclub on St. Peter Avenue called Whiskey–A–Go–Go. As the story went, X–998 said that the Landreville's [sic] and Conroy decided that the place had to go and that Blackie Landreville did the actual torching. Montpetit related that Conroy, as the Fire Chief, successfully intervened so that no arson investigation was done at the scene, and the insurance paid off.

*Id.* Ex. D. Whiskey–A–Go–Go had been renamed the Showboat at the time of the fire. Ison Aff. ¶ 9(b)(ii).

4. A July 29, 1976 MBCA report summarizing statements by confidential source S–838 that "Fran McDonough, who operated the now destroyed McDonough's Bar, on Concord Ave., St. Paul, allegedly received his financing from St. Paul Fire Chief Steve Conroy." *Id.* Ex. E. McDonough's burned in the summer of 1975. Ison Aff. ¶ 9(c).

5. A January 31, 1978 MBCA report stating that "[s]everal unconformed [sic] allegations contend that Steve Conroy had a financial interest in McDonough's." *Id.* Ex. F.

6. A July 3, 1974 Minnesota Attorney General Organized Crime Intelligence Unit report summarizing statements by a confidential source that

> Reportedly, around 1965, Conroy had an interest in the Flamingo Bar. He was incorporated under the title, C & G, Inc. Shortly thereafter, in 1965, George Schaumburg and John Anzevino purchased Conroy's interest in C & G. After Schaumburg and Anzevino experienced a fire, and the Flamingo was closed, the Arrigoni brothers, under the

title, "ASA Corporation" took over that liquor license.

*Id.* Ex. G.

7. A June 11, 1975 Minnesota Attorney General Organized Crime Intelligence Unit report regarding an individual who "is believed to own an interest in DENNY'S LOFT together with St. Paul Fire Chief Conroy. Conroy allegedly owns, or has an interest in, the following bars: The Chain Link (used to be known as Conroy's); the SPA, on W. 7th St.; the CRUSADER, PATRICK'S and LA NASAS." *Id.* Ex. H.

8. A September 10, 1976 MBCA report summarizing an interview with Bob Schnoeker, who stated that

> a Mexican from Leobuck [sic], Texas, ... had opened a Mexican restaurant at 1201 Payne, the former location of the Crusader. Last week the restaurant equipped with a $40,000 kitchen was destroyed by fire. Bob suspects arson as he was in the restaurant on a Friday evening, and there was no business.

*Id.* Ex. J.

Plaintiff asserts that a fair report of these public records would say that two bars (he does not specify which bars) in which Conroy allegedly had investments at one time sustained fires. Defendants assert that these records mention five bars in which fires had occurred and in which plaintiff was alleged to have been financially involved. Defendants further assert that even if plaintiff were correct in his contention that the records revealed only two such bars, the challenged statement would be privileged as a *substantially* accurate report of the records.

The Court agrees that the challenged statement is a substantially accurate reflection of the records submitted. The records indicate that, according to various sources, Conroy had at one time or another alleged interests in Whisky–A–Go–Go (later named the Showboat), McDonough's, the Crusader, and the Flamingo. The records also show that each of these bars (or, in the case of the Crusader, its successor establishment) experienced fires. The records are not clear about whether plaintiff had interests in all these establishments when

they experienced fires; however, the challenged statement does not say that Conroy's interests coincided with the dates of the fires. It says only that four bars in which Conroy held an interest at one time had burned. This is a substantially accurate summary of the records. Therefore, the Court will grant defendants' motion as to paragraph XIII(dd) of the amended complaint.

### D. Amended Complaint, Paragraph XIII(jj)

■ The statement objected to in this paragraph is as follows:

The fire department's role in determining the cause of the [Horatio Hornblower's] fire is unclear. Nowhere in fire records turned over to the Star Tribune—records that department officials say are complete—is there any determination of arson. A newspaper story reported a month after the fire that police labeled the fire suspicious, however, the news story said St. Paul fire department investigators would say only that the cause of the fire is undetermined.

Am.Compl. ¶ XIII(jj).

In support of their motion to strike this paragraph, defendants submit all the St. Paul Fire Department reports obtained by the Star Tribune that concern the fire at Horatio Hornblower's. None of the reports mentions the possibility of arson. One of the reports, dated January 1, 1982, states that "it is possible this was an accidental fire of electrical cause." Ison Aff. Ex. P. Defendants also submit a copy of a February 3, 1982 article from the St. Paul Pioneer Press which states, in part: "St. Paul police arson investigators are now calling the New Year's fire at the Lowry Square suspicious and no longer believe it was caused by an electrical wreath. St. Paul Fire Department investigators would say only that the cause of the fire is undetermined." *Id.* Ex. Q.

Plaintiff contends that the challenged statement is not a fair report of information contained in public records, because the records relied on show that the police force, and not the fire department, was responsible for determining the cause of the fire. Thus, plaintiff argues, reporting that the fire department's role in determining the cause of the fire was unclear is not fair and accurate. The records relied on, however, do not show that the police force was solely responsible for investigating the fire. The St. Paul Fire Department records submitted by defendants bear the label "Fire Investigation Report" and discuss possible causes of the fire. The St. Paul Pioneer Press article does state that police were investigating the fire, but also states that fire department investigators said the cause of the fire was undetermined. Thus, the documents show that investigators from both the fire department and the police department were involved in investigating the fire; given that circumstance, the statement that the fire department's role in the investigation is unclear is a fair and accurate summary of the records. Therefore, the Court will grant defendants' motion as to paragraph XIII (jj) of the amended complaint.

### E. Amended Complaint, Paragraph XV(1)

■ The statement objected to in this paragraph is as follows:

In 1975, for instance, fire destroyed a large downtown St. Paul nightclub called the Showboat. The club had been owned by longtime associates of Chief Conroy. During the 1970s police probe of hidden bar ownerships and alleged arson, a State agent had obtained information that the chief himself had an interest in the bar.

Am.Compl. ¶ XV(1).

Defendants assert that this statement is a fair report of the August 16, 1978 police report referring to allegations that several bars that had experienced arson fire were linked to Steve Conroy (Ison Aff.Ex. B), as well as a fair report of the more specific allegations in the August 14, 1978 police report referring to allegations that Conroy was a hidden owner of the Showboat, which was destroyed by fire (*id.* Ex. C). Defendants also point to two MBCA re-

ports linking Conroy to the family that owned the Showboat. *Id.* Exs. D, J.

The Court concludes that the records submitted by defendants support the assertion that the Showboat was owned by associates of Conroy and that during the 1970s police investigation, a state agent obtained information that plaintiff had an interest in the Showboat. Therefore, the Court will grant defendants' motion as to paragraph XV(1).

### F. Amended Complaint, Paragraph XV(m)

The statement objected to in this paragraph is as follows:

> It is clear that Conroy's department did little to investigate the early morning fire, even though it was listed as suspicious and possibly arson, and caused an estimated $150,000 damage.

Am.Compl. ¶ XV(m).

In support of their motion, defendants have submitted the St. Paul Fire Department's Fire Investigation Report and the investigator's handwritten notes concerning the fire at issue. Ison Aff.Exs. N, O. Plaintiff does not assert that these records do not support the statement that the fire was labeled suspicious or that it caused a significant amount of damage. Rather, he argues that the records submitted do not support the statement that "it is clear that Conroy's department did little to investigate the early morning fire." Am.Compl. ¶ XV(m). Defendants have withdrawn that portion of the statement from the present motion. Therefore, the Court will strike only the last two clauses of this paragraph, which refer to the suspicious nature of the fire and the damage it caused.

### IV. *Intentional Infliction of Emotional Distress*

 The tort of intentional infliction of emotional distress has four elements: 1) the conduct must be extreme and outrageous; 2) the conduct must be intentional or reckless; 3) it must cause emotional distress; and 4) the distress must be severe. *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 438–39 (Minn.

1983). A plaintiff claiming intentional infliction of emotional distress must clear a high threshold before his case may be submitted to the jury: only behavior that is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community" is actionable under the tort. *Id.* at 439 (citations omitted). The question of whether a defendant's behavior may reasonably be considered so extreme and outrageous as to permit recovery is a question for the court. Restatement (Second) of Torts § 46, comment h (1965).

 Defendants argue that the facts in this case are simply not egregious enough to sustain a claim of intentional infliction of emotional distress. Merely publishing a series of news stories about a public figure on a matter of public concern cannot, they argue, be considered extreme and outrageous conduct. Moreover, defendants contend, courts should be especially reluctant to allow damages for intentional infliction of emotional distress against media defendants in cases involving the publication of matters of general public concern, because allowing damages in such cases could chill debate about public issues and officials.

In response, plaintiff argues that by accusing a fire chief of associating with arsonists to help them profit, after the fire chief cooperated with the investigators to help them find the truth, defendants engaged in extreme and outrageous behavior. Plaintiff asserts that defendants' behavior has irreversibly tarnished plaintiff's reputation and caused him such severe emotional distress that he now has a heart condition and poor health. Finally, plaintiff argues that, far from requiring a stronger showing of outrageous behavior in cases involving public officials, courts should recognize that behavior that defames a public figure and damages his reputation is more extreme and outrageous than it would be if the target were a lay person.

The Court concludes that plaintiff has failed to set forth facts indicating that defendants' behavior was so atrocious that it passed the boundaries of decency. As de-

**1468**

fendants note, courts applying Minnesota law have been extremely cautious in allowing intentional infliction of emotional distress claims to go to the jury. Thus, in *Price v. Viking Press, Inc.*, 625 F.Supp. 641, 650–51 (D.Minn.1985), the court dismissed the plaintiff FBI agent's claims that defamatory statements accusing him of covering up a murder, suborning perjury, engaging in harassment and illegal investigatory activities, failing to investigate major crimes, and physically threatening witnesses constituted intentional infliction of emotional distress under Minnesota law. The *Price* court reasoned that, while some defamatory statements could be so outrageous as to sustain an action for intentional infliction of emotional distress, the particular statements made against the FBI agent, a public official, were not utterly intolerable in a civilized society. The statements in the instant case, like the statements in *Price*, accuse a public official of misconduct. The statements, like the statements in *Price*, are not statements that are utterly intolerable in a civilized society. Therefore, the Court holds that, as a matter of law, defendants' conduct is not sufficiently extreme and outrageous to give rise to a claim of intentional infliction of emotional distress.

Accordingly, based on the foregoing, and upon all the files, records and proceedings herein,

IT IS ORDERED that:

1. defendants' motion for partial summary judgment is granted; and

2. The following portions shall be stricken from the amended complaint: paragraphs XII, XIV, XVI, XX, XXI, XXV, XXVI, XXVII; paragraph XIII, subdivisions (e), (f), (h) (first clause), (k) (last two sentences), (n), (*o*), (q), (s), (t), (u), (aa), (bb), (cc), (dd), (ee), (ff), (jj); paragraph XV, subdivisions (e), (*l*), (m) (last two clauses).